# 25-2818-cv

## United States Court of Appeals
*for the*
## Second Circuit

NATIONAL RETAIL FEDERATION,

*Plaintiff-Appellant,*

– v. –

LETITIA JAMES, in her official capacity as Attorney General of New York,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

# BRIEF AND SPECIAL APPENDIX FOR PLAINTIFF-APPELLANT

AMBIKA KUMAR
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104
(206) 757-7700

– and –

ALEXANDRA PERLOFF-GILES
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 42nd Floor
New York, New York 10020
(212) 402-4043

DAVID M. GOSSETT
DAVIS WRIGHT TREMAINE LLP
1301 K Street, NW, Suite 500 East
Washington, DC 20005
(202) 262-4156

– and –

ADAM SIEFF
DAVIS WRIGHT TREMAINE LLP
350 South Grand Avenue, 27th Floor
Los Angeles, California 90071
(213) 633-6800

*Attorneys for Plaintiff-Appellant*

COUNSEL PRESS (800) 4-APPEAL • (388570)

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiff-Appellant the National Retail Federation certifies that it is a private, non-profit, tax-exempt organization with no corporate affiliates, subsidiaries, or parent corporations. No publicly traded corporation owns 10% or more of the National Retail Federation.

# TABLE OF CONTENTS

**Page**


CORPORATE DISCLOSURE STATEMENT ........ i

TABLE OF AUTHORITIES ........ iv

PRELIMINARY STATEMENT ........ 1

JURISDICTIONAL STATEMENT ........ 3

ISSUES PRESENTED ........ 4

STATEMENT OF THE CASE ........ 5

A. The Algorithmic Pricing Disclosure Act ........ 5

B. The Act's effects on NRF members ........ 7

C. The District Court's decision ........ 12

SUMMARY OF ARGUMENT ........ 14

STANDARD OF REVIEW ........ 17

ARGUMENT ........ 18

I. The District Court Erred By Holding That *Zauderer* Review Applies To NRF's First Amendment Claims. ........ 18

A. Determination of what level of scrutiny applies was premature. ........ 19

B. NRF plausibly alleged that at least *Central Hudson* intermediate scrutiny—not *Zauderer*—applies. ........ 22

1. The Act discriminates based on content and speaker. ........ 24

2. The Act does not address the State's interest in preventing consumer deception. ........ 29

3. The compelled disclosure is not "purely factual." ........ 32

4. The compelled disclosure is controversial. ........ 37

II. NRF Plausibly Alleged That The Act Fails First Amendment Scrutiny. ........ 40

A. Dismissal was inappropriate assuming intermediate scrutiny applies to the Act. ........ 42

## TABLE OF CONTENTS (continued)

**Page**

B. NRF plausibly alleged that, even if *Zauderer* were the proper standard, the Act does not satisfy that standard. .... 48

1. The Act is "unjustified." .... 49

2. The Act is "unduly burdensome." .... 52

III. At A Minimum, The District Court Abused Its Discretion In Dismissing With Prejudice .... 55

CONCLUSION .... 58

CERTIFICATE OF SERVICE .... 60

CERTIFICATE OF COMPLIANCE .... 61

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1-800-411-Pain Referral Serv., LLC v. Otto*,
744 F.3d 1045 (8th Cir. 2014) .......... 25

*Am. Meat Inst. v. USDA*,
760 F.3d 18 (D.C. Cir. 2014) .......... 48

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 18

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
591 U.S. 610 (2020) .......... 27

*Bloch v. Bouchey*,
2023 WL 9058377 (D. Vt. Dec. 28, 2023), *appeal withdrawn*, 2024 WL 3507743 (2d Cir. Mar. 27, 2024) .......... 21

*Brady v. Anker Innovations Ltd.*,
2020 WL 158760 (S.D.N.Y. Jan. 13, 2020) .......... 37

*Brewer v. W. Irondequoit Cent. Sch. Dist.*,
212 F.3d 738 (2d Cir. 2000) .......... 41

*Brooklyn Branch of NAACP v. Kosinski*,
657 F. Supp. 3d 504 (S.D.N.Y. 2023) .......... 36

*Bruni v. City of Pittsburgh*,
824 F.3d 353 (3d Cir. 2016) .......... 20

*Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*,
29 F.4th 468 (9th Cir. 2022) .......... 32

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
447 U.S. 557 (1980) .......... 22, 42

## TABLE OF AUTHORITIES (continued)

**Page(s)**

*Chamber of Com. of U.S. v. Cal. Air Res. Bd.*,
2024 WL 4683286 (C.D. Cal. Nov. 5, 2024) .......... 20

*City of Cincinnati v. Discovery Network, Inc.*,
507 U.S. 410 (1993) .......... 26, 46

*CompassCare v. Hochul*,
125 F.4th 49 (2d Cir. 2025) .......... 28, 30, 39

*Cornelio v. Connecticut*,
32 F.4th 160 (2d Cir. 2022) .......... *passim*

*Cortec Indus., Inc. v. Sum Holding L.P.*,
949 F.2d 42 (2d Cir.1991) .......... 18, 56

*CTIA v. City of Berkeley*,
928 F.3d 832 (9th Cir. 2019) .......... 37

*Dana's R.R. Supply v. Att'y Gen., Fla.*,
807 F.3d 1235 (11th Cir. 2015) .......... 23

*Edenfield v. Fane*,
507 U.S. 761 (1993) .......... 45

*Faber v. Metro. Life Ins. Co.*,
648 F.3d 98 (2d Cir. 2011) .......... 18

*Foman v. Davis*,
371 U.S. 178 (1962) .......... 56, 57

*FTC v. Colgate-Palmolive Co.*,
380 U.S. 374 (1965) .......... 36

*Graff v. City of Chicago*,
9 F.3d 1309 (7th Cir. 1993) .......... 41

*Greater New Orleans Broad. Ass'n, Inc. v. United States*,
527 U.S. 173 (1999) .......... 46

**TABLE OF AUTHORITIES (continued)**

**Page(s)**

*Greater Phila. Chamber of Com. v. City of Philadelphia*,
949 F.3d 116 (3d Cir. 2020) .................................................. 23

*Grocery Mfrs. Ass'n v. Sorrell*,
102 F. Supp. 3d 583 (D. Vt. 2015) .......................................... 21

*Hayes v. N.Y. Att'y Grievance Comm.*,
672 F.3d 158 (2d Cir. 2012) .................................................. 51

*Hesse v. Godiva Chocolatier, Inc.*,
463 F. Supp. 3d 453 (S.D.N.Y. 2020)........................................ 37

*Ibanez v. Fla. Dep't of Bus. & Prof. Regul., Bd. of Accountancy*,
512 U.S. 136 (1994)................................................................ 51

*IMS Health Inc. v. Sorrell*,
630 F.3d 263 (2d Cir. 2010), *aff'd*, 564 U.S. 552 (2011) ............... 42, 47

*In re Time Warner Inc. Sec. Litig.*,
9 F.3d 259 (2d Cir. 1993) ...................................................... 36

*Int'l Dairy Foods Ass'n v. Amestoy*,
92 F.3d 67 (2d Cir. 1996) ............................................ 20, 44, 50

*J.S. v. N.Y. State Dep't of Corr. & Cmty. Supervision*,
76 F.4th 32 (2d Cir. 2023).................................................... 17

*Lochner v. New York*,
198 U. S. 45 (1905)................................................................ 25

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015) .................................................. 56

*Melendez v. City of New York*,
16 F.4th 992 (2d Cir. 2021).................................................... 53

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
559 U.S. 229 (2010)................................................................ 30

## TABLE OF AUTHORITIES (continued)

**Page(s)**

*Narce v. Mervilius*,
2023 WL 7128475 (D.D.C. Oct. 30, 2023) .......... 19

*Nat'l Ass'n of Mfrs. v. SEC*,
800 F.3d 518 (D.C. Cir. 2015) .......... 32

*Nat'l Ass'n of Wheat Growers v. Bonta*,
85 F.4th 1263 (9th Cir. 2023) .......... *passim*

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*,
272 F.3d 104 (2d Cir. 2001) .......... 31, 44, 45

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
585 U.S. 755 (2018) .......... *passim*

*Nat'l Inst. of Fam. & Life Advocs. v. Clark*,
737 F. Supp. 3d 246 (D. Vt. 2024) .......... 41

*NetChoice v. Brown*,
2025 WL 3267786 (D. Md. Nov. 24, 2025) .......... 19

*N.Y. State Ass'n of Realtors, Inc. v. Shaffer*,
27 F.3d 834 (2d Cir. 1994) .......... 47

*N.Y. State Rest. Ass'n v. N.Y. City Bd. of Health*,
556 F.3d 114 (2d Cir. 2009) .......... *passim*

*Pavone v. Puglisi*,
353 F. App'x 622 (2d Cir. 2009) .......... 56

*Poughkeepsie Supermkt. Corp. v. County of Dutchess*,
140 F. Supp. 3d 309 (S.D.N.Y. 2015) .......... 31

*Poughkeepsie Supermkt. Corp. v. Dutchess County*,
648 F. App'x 157 (2d Cir. 2016) .......... 31, 39

*R.A.V. v. City of St. Paul*,
505 U.S. 377 (1992) .......... 23

**TABLE OF AUTHORITIES (continued)**

**Page(s)**

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015)....23, 24, 28

*Ronzani v. Sanofi S.A.*,
899 F.2d 195 (2d Cir. 1990)....55, 56

*Rubin v. Coors Brewing Co.*,
514 U.S. 476 (1995)....46

*Safelite Grp., Inc. v. Jepsen*,
764 F.3d 258 (2d Cir. 2014)....31

*Schindler v. French*,
232 F. App'x 17 (2d Cir. 2007)....56

*Sorrell v. IMS Health, Inc.*,
564 U.S. 552 (2011)....*passim*

*Turner Broad. Sys., Inc. v. FCC*,
512 U.S. 622 (1994)....50

*United States v. Lierman*,
151 F.4th 530 (4th Cir. 2025)....28

*United States v. Virginia*,
518 U.S. 515 (1996)....44

*Volokh v. James*,
148 F.4th 71 (2d Cir. 2025)....*passim*

*Volvo N. Am. Corp. v. Men's Int'l Pro. Tennis Council*,
857 F.2d 55 (2d Cir. 1988)....56

*Vugo, Inc. v. City of New York*,
931 F.3d 42 (2d Cir. 2019)....25

*Wandering Dago, Inc. v. Destito*,
879 F.3d 20 (2d Cir. 2018)....26

## TABLE OF AUTHORITIES (continued)

**Page(s)**

*Zauderer v. Off. of Disciplinary Counsel*,
471 U.S. 626 (1985) ........ *passim*

### Constitutional Provisions

U.S. Const. amend 1 ........ *passim*

U.S. Const. amend. 14 ........ 4

### Statutes

28 U.S.C. § 1291 ........ 3

28 U.S.C. § 1331 ........ 3

28 U.S.C. § 1343 ........ 3

28 U.S.C. § 2201 ........ 3

N.Y. Gen. Bus. Law § 349-a ........ *passim*

### Rules

Fed. R. Civ. P. 12(b)(6) ........ 17

### Other Authorities

Christopher Beam, *Welcome to Pricing Hell*, THE ATLANTIC
(Apr. 16, 2024), https://perma.cc/3FZP-WQ63 ........ 15

Jerod Coker & Jean-Manuel Izaret, *Progressive Pricing: The Ethical Case for Price Personalization*, 173 J. BUS. ETHICS
387 (2021), https://perma.cc/SYE7-CCZQ ........ 39

Juan M. Elegido, *The Ethics of Price Discrimination*,
21 BUS. ETHICS QUARTERLY 633 (Oct. 2011),
https://perma.cc/ERS8-RF8D ........ 10

**TABLE OF AUTHORITIES (continued)**

**Page(s)**

FTC, *FTC Surveillance Pricing 6(b) Study: Research Summaries, A Staff Perspective* (Jan. 2025), https://perma.cc/CM65-8N59 .......... 43, 50

Pedro Gonzaga et al., *Personalised Pricing in the Digital Era, Background Note by the Secretariat, Directorate for Financial & Enterprise Affairs Competition Committee*, Organisation For Econ. Co-Operation & Dev. (Nov. 28, 2018), https://perma.cc/47ZP-FXQX .......... 10

Alexander MacKay et al., *Dynamic Pricing, Intertemporal Spillovers, and Efficiency* (Harvard Bus. Sch. Strategy Unit), Working Paper (last revised Jan. 9, 2024), https://perma.cc/SW4G-JVPM .......... 9

Alfred Ng, *The fight over unfair pricing goes national*, POLITICO (May 28, 2025), https://perma.cc/JH9G-LZX5 .......... 38

*Personal data*, Cambridge Dictionary, https://perma.cc/NDV8-D9UA (last visited Jan. 6, 2026) .......... 58

*Personal data*, Oxford English Dictionary, https://perma.cc/DSY4-KE8V (last visited Oct. 22, 2025) .......... 58

Kevin R. Williams, *The Welfare Effects of Dynamic Pricing: Evidence from Airline Markets*, 90 ECONOMETRICA 831 (Mar. 2022), https://perma.cc/7PZG-UVQZ .......... 9

## PRELIMINARY STATEMENT

New York's new Algorithmic Pricing Disclosure Act (Act), N.Y. Gen. Bus. Law § 349-a, compels retailers of all sizes to post an ominous-sounding disclosure anywhere they show a consumer a price informed algorithmically by any data linked to the consumer: "THIS PRICE WAS SET BY AN ALGORITHM USING YOUR PERSONAL DATA."

Before the law took effect, Plaintiff-Appellant the National Retail Federation (NRF) brought this First Amendment challenge. NRF alleged that the compelled disclosure harms retailers in two ways: (1) It creates the false impression that retailers are accessing and exploiting sensitive personal data—like income or health information—rather than benign data like membership in the retailer's loyalty club or the fact that the customer has put an item in her virtual shopping cart; and (2) it creates the false impression that retailers routinely *increase* prices based on that data, rather than *lowering* prices in the same way brick-and-mortar retailers have long done through targeted coupons and promotions.

Though courts "rarely, if ever" decide First Amendment challenges on a motion to dismiss, *Cornelio v. Connecticut*, 32 F.4th 160, 172 (2d

Cir. 2022), and though it is undisputed that the law implicates the First Amendment interests of NRF members, the District Court nevertheless dismissed the Complaint with prejudice. In so doing, the court resolved numerous contested questions of fact contrary to the well-pled allegations in the Complaint. This Court should reverse.

*First*, the District Court erred in determining at the pleading stage that the First Amendment standard articulated in *Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626 (1985), applies to NRF's challenge. The court correctly held that the Act triggers at least some form of First Amendment review. It should have stopped there—waiting, as other courts have done, for the development of a factual record before determining the applicable standard of review. The decision to apply *Zauderer* was in any event based on erroneous determinations that the disclosure's speaker-based distinctions are of no constitutional moment; that the disclosure is needed to remedy consumer deception; and that the disclosure is purely factual and uncontroversial.

*Second*, the District Court erred in disregarding NRF's factual allegations to hold that the Act withstands First Amendment scrutiny.

Appropriately crediting those allegations, the court should have applied intermediate scrutiny—under which dismissal was inappropriate because the State did not identify any substantial government interest directly and materially advanced by the Act, and because, even had it done so, NRF alleged that the Act regulates more speech than necessary to achieve its putative aims. And dismissal was inappropriate even under *Zauderer* because NRF plausibly alleged facts to support a finding that the Act is not justified by any consumer harm and unduly burdens speech.

*Third*, the District Court erred by dismissing the Complaint with prejudice, rather than providing NRF an opportunity to amend. If given that opportunity, NRF would plead additional facts to show that, if anything is speculative, it is the harm the State purports to remediate—not the effect of the disclosure on customers and retailers.

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1343, and 2201.

This Court has jurisdiction over this appeal under 28 U.S.C. § 1291 because the District Court entered judgment dismissing the

action with prejudice on October 8, 2025, and NRF filed a timely notice of appeal on October 31, 2025.

## ISSUES PRESENTED

(1) Whether the District Court erred in applying *Zauderer* scrutiny to NRF's claims under the First and Fourteenth Amendments at the pleading stage, when the compelled disclosure, as alleged, (a) arbitrarily singles out some commercial speakers based on the subject matter of their advertisements, (b) does not seek to correct any misleading commercial speech, (c) is not purely factual, because it falsely implies exploitative pricing and/or use of sensitive personal information, and (d) is not uncontroversial, because it forces retailers to denounce conduct they believe to be welfare-enhancing.

(2) Whether the District Court erred in holding that the Act survives First Amendment scrutiny at the pleading stage under either intermediate or *Zauderer* scrutiny.

(3) Whether the District Court erred in dismissing NRF's lawsuit with prejudice, when NRF had not previously had an opportunity to amend its Complaint and when amendment would cure the Complaint's purported deficiencies.

## STATEMENT OF THE CASE

### A. The Algorithmic Pricing Disclosure Act

On May 9, 2025, New York enacted the Algorithmic Pricing Disclosure Act as part of an omnibus budget bill. *See* A-11 (Compl. ¶ 2); *see generally* N.Y. Gen. Bus. Law § 349-a. The Act was passed less than two months after its introduction, with little deliberation, no substantive hearings or factual findings, and no evidence of any actual consumer harm. *See* A-11 (Compl. ¶ 2); SPA-22 (Act "does not have an extensive legislative history").

The Act applies to the sale of virtually any product online. Specifically, any entity doing business in New York that "sets the price of a specific good or service using personalized algorithmic pricing, and that directly or indirectly, advertises, promotes, labels or publishes a statement, display, image, offer or announcement of personalized algorithmic pricing to a consumer in New York, using personal data specific to such consumer, shall include with such statement, display, image, offer or announcement, a clear and conspicuous disclosure that states: 'THIS PRICE WAS SET BY AN ALGORITHM USING YOUR PERSONAL DATA.'" N.Y. Gen. Bus. Law § 349-a(2).

The Act defines "personalized algorithmic pricing" as "dynamic pricing set by an algorithm that uses personal data," and defines "personal data" as "any data that identifies or could reasonably be linked, directly or indirectly, with a specific consumer or device." *Id.* § 349-a(1)(d), (f). The required disclosure must be "in the same medium as" and "on, at or near and contemporaneous" with the "announcement of the price." *Id.* § 349-a(1)(b). Each violation of the Act can result in penalties of up to $1,000. *Id.* § 349-a(4).

The Act exempts from the mandatory-disclosure requirement (1) insurance companies; (2) certain financial institutions; and (3) entities offering prices to consumers "who ha[ve] an existing subscription-based contract or subscription-based agreement for goods or services with an entity," "where such price is less than the price for the same good or service set forth in the subscription-based agreement or subscription-based contract." *Id.* § 349-a(3). The Act's definition of "[p]ersonal data" excludes "location data that is used by a for-hire vehicle …, or a transportation network company …, solely to calculate the fare based on mileage and trip duration between the passenger's pickup and drop-off locations." *Id.* § 349-a(1)(d).

### B. The Act's effects on NRF members

NRF is the world's largest retail trade association. A-12 (Compl. ¶ 5). Its members range from small family businesses to large national and international online retailers. *See id.* They include grocery stores, department stores, book stores, discount stores, restaurants, and home goods and specialty stores, to name just a few. *Id.* While many NRF members are based in New York, many more sell online to customers across the country, including customers in New York. *Id.*

Like other retailers, NRF members often use what some call "dynamic pricing" or "algorithmic pricing"—using computer programs to analyze data and publish prices according to instructions set by humans. A-13–14 (Compl. ¶ 11). This practice could also just be called "pricing"—using a variety of inputs to arrive at an appropriate price at which to sell an item. A department store seeking to clear inventory of a particular shoe, for example, might discount the price of a shoe for customers who have added it to their shopping cart but not yet purchased it—and these days, the store might use an algorithm to automate the process. *Id.* Other retailers might offer discounts to customers who have never visited their website before, or "Buy X, Get

Y" promotions to customers who have viewed multiple products made by a particular brand or have a history of buying the same item, again using an algorithm to serve the promotion. *See* A-13–14 (Compl. ¶¶ 11, 13).

In essence, algorithmic pricing permits retailers to adapt traditional retail practices to the online environment and use them at scale. A-14 (Compl. ¶ 12). Businesses have long offered personalized prices of various kinds. *Id.* A grocery or drug store may offer a coupon at checkout for items similar to those purchased. *Id.* Gas stations may offer free car washes to certain credit card holders. *Id.* And coffee shops may offer reward cards entitling regular customers to a free coffee every tenth cup. *Id.* Through such targeted promotions, customers save money while businesses build loyalty and optimize their inventory. *Id.* Pricing algorithms generally rely on the same types of commonplace, non-sensitive, and voluntarily shared information about customers' product preferences and purchasing habits. *Id.* With software that allows them to implement rules for when to offer discounts, retailers can better manage inventory and reduce the transaction costs

associated with determining, on a person-by-person basis, who is eligible for a discount and then applying that discount. *Id.*

While the State's compelled disclosure assumes the use of algorithmic pricing writ large is harmful, the academic literature belies that assumption. Studies—cited in the Complaint—have shown that algorithmic pricing in the aggregate lowers consumer prices. A-15 (Compl. ¶ 15). One study concerning airline pricing, for example, demonstrates that "[w]hen aggregated over markets, welfare is higher under dynamic pricing than under uniform pricing."[1] Another study concerning algorithmic pricing in restaurant food delivery similarly concluded that, "[o]n average, the pricing algorithm reduced prices"; its analysis suggests "that production costs fell and consumer welfare increased after adoption [of the algorithm], highlighting potential efficiency gains of dynamic pricing algorithms."[2] A report prepared by the Organisation for Economic Co-operation and Development

[1] Kevin R. Williams, *The Welfare Effects of Dynamic Pricing: Evidence from Airline Markets*, 90 ECONOMETRICA 831 (Mar. 2022), https://perma.cc/7PZG-UVQZ (cited at A-15 (Compl. ¶ 15 n.1 & n.2)).

[2] Alexander MacKay et al., *Dynamic Pricing, Intertemporal Spillovers, and Efficiency* (Harvard Bus. Sch. Strategy Unit), Working Paper (last revised Jan. 9, 2024), https://perma.cc/SW4G-JVPM (cited at A-15 (Compl. ¶ 15 n.1 & n.2)).

explained that "[p]ersonali[z]ed pricing, like any price discrimination, is typically pro-competitive and often enhances consumer welfare."[3] And an article in *Business Ethics Quarterly* explained that "price discrimination is not inherently unfair" because "the fact that some people get an even better deal than do others does not entail that the latter are wronged."[4]

Just as algorithmic pricing helps both consumers and retailers, punishing it hurts both. As alleged in the Complaint, the Act compels NRF members to post a warning any time a price is set using algorithmic pricing based in some way on customer information. *See* A-15–16, 18–20 (Compl. ¶¶ 17, 24, 27). That warning sounds ominous—with its reference to "personal data," which triggers fears about privacy and surveillance; its implication that the consumer is being charged more or being treated unfairly vis-à-vis other consumers; and its use of

[3] Pedro Gonzaga et al., *Personalised Pricing in the Digital Era, Background Note by the Secretariat, Directorate for Financial & Enterprise Affairs Competition Committee*, Organisation For Econ. Co-Operation & Dev. (Nov. 28, 2018), https://perma.cc/47ZP-FXQX (cited at A-15 (Compl. ¶ 15 n.2)).

[4] Juan M. Elegido, *The Ethics of Price Discrimination*, 21 BUS. ETHICS QUARTERLY 633 (Oct. 2011), https://perma.cc/ERS8-RF8D (cited at A-15 (Compl. ¶ 15 n.2.).

the passive voice to suggest machines rather than humans are setting prices. It gratuitously causes consumers to feel they are being manipulated for profit, when, in reality, the retailer may simply be offering a small discount. *See* A-18–20 (Compl. ¶¶ 23, 26).

Further, as NRF alleged in the Complaint, the Act forces NRF members to either endorse a statement that they believe will mislead or confuse customers and with which they disagree, or forego the New York market. *See* A-11–12, 18–20 (Compl. ¶¶ 1, 2, 4, 24, 26). To the extent they choose to comply with the law, NRF members will have to cede valuable online real estate to the disclosure, such that the government's preferred speech displaces their own—not only on product pages, but also on search result pages, on "suggested product" pages, in the customer's shopping cart, and on advertisements for products sold through third-party websites. *See* A-20 (Compl. ¶ 27). NRF members will also run the risk that consumers will be put off by the warning and the tacit implication that sensitive personal data was used to raise prices, and will choose not to complete transactions at all. *Id.*

### C. The District Court's decision

On July 2, 2025, NRF filed this action to challenge the constitutionality of the Act's compelled disclosure requirement. Together with the Complaint, NRF also filed a motion for a preliminary injunction, along with a number of supporting declarations from NRF member-retailers. Following briefing on both that motion and the State's motion to dismiss, the District Court heard argument on September 10, 2025. On October 8, 2025, the District Court granted the motion to dismiss, dismissing the case with prejudice, and denying the motion for a preliminary injunction as moot.

The District Court first held that *Zauderer* review applies to all commercial disclosure requirements because, in the court's view, "a disclosure mandate, by its nature, imposes no restriction whatsoever on the free flow of ideas." SPA-10. *Zauderer*, the court held, "is not limited … to disclosures narrowly designed to 'correct' specific instances of 'deceptive commercial speech,'" but rather "is 'broad enough to encompass nonmisleading disclosure requirements.'" SPA-18. The District Court further held that this mandatory disclosure is "factual" because the Act "by its terms applies only when a price was set using

personalized algorithmic pricing," such that the disclosure necessarily "accurately describes plaintiff's members' practices." SPA-11–12 (cleaned up). In the District Court's view, NRF's allegations that the statement misleadingly suggests that "price setting algorithms are 'dangerous,'" "involve 'non-consensual invasive surveillance,'" and "set prices in ways that are harmful to the consumer" are "merely speculat[ive]." SPA-12–13 (cleaned up). The District Court also held that the required disclosure is "uncontroversial"—even though retailers "would prefer to make a different statement on that same topic"—because, among other things, "the required disclosure here relates only to practices that plaintiff's members actually employ in dealing with their own customers." SPA-15, 17.

Next, the District Court purported to apply *Zauderer* scrutiny and held that—notwithstanding the fact that "the Act does not have an extensive legislative history"—the Act is "reasonably related to the government's legitimate interest in ensuring that consumers are 'inform[ed]' about the terms on which products are offered to them, including the price." SPA-21–22. The court further held that the disclosure requirement is not "unduly burdensome," even though NRF

alleged that it displaces NRF members' own speech, because "[d]isclosure requirements … often pertain to displays with limited space"; "pixel space" supposedly "by its nature is not so space-limited as [] traditional print advertising"; and "the fact that a disclosure mandate might theoretically require plaintiff's members to 'surrender' a 'significant amount' of 'pixel space' does not plausibly indicate that complying with the mandate will 'rule out' the possibility' that plaintiff's members will speak at all." SPA-25–27. The court disregarded NRF's allegations of underinclusivity as "implausible," SPA-27, and did not address NRF's factual allegations that the Act is unduly burdensome because it applies even to discounts, *see* A-13–16, 19, 23 (Compl. ¶¶ 10–15, 15 n.1 & n.2, 19, 25, 36).

The District Court directed that dismissal be with prejudice, SPA-28, without analysis of whether amendment could cure the purported defects in the Complaint and without briefing on the issue.

## SUMMARY OF ARGUMENT

The District Court committed three reversible errors.

*First*, the District Court held without the benefit of an evidentiary record that *Zauderer* scrutiny applies, on the grounds that the

disclosure is purely factual and uncontroversial and "serves to ameliorate 'consumer confusion or deception.'" SPA-11, 15, 19. But the District Court should not have determined the appropriate level of First Amendment scrutiny at the motion-to-dismiss stage, let alone by disregarding the Complaint's express allegations that the disclosure creates rather than remediates confusion. *See* Part I.A, *infra.*

In any case, application of *Zauderer* scrutiny was wrong. At least intermediate scrutiny applies, for four independent reasons:

- The Act is rife with exceptions, and thus discriminates against some speakers by subjecting them to regulation based on the subject matter of their speech;
- The Act does not seek to correct any deceptive speech or even—as the District Court thought sufficient—provide information consumers would find "material";
- The Act is not "purely factual" because it is "misleading and, in that sense, untrue." *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1276 (9th Cir. 2023); and
- The Act is controversial because it requires retailers to enter the public debate about algorithmic pricing and endorse the view that such pricing schemes, despite being economically rational, are problematic. *See, e.g.*, Christopher Beam, *Welcome to Pricing Hell*, THE ATLANTIC (Apr. 16, 2024), https://perma.cc/3FZP-WQ63 (explaining that many customers consider algorithmic pricing using personal data "taboo," though "[t]o an economist, it is the height of rationality").

*See* Part I.B, *infra.*

*Second*, the District Court erred in holding that, despite NRF's allegations, the Act survives First Amendment scrutiny.

When subjected to intermediate scrutiny—as the Complaint's allegations require—the Act fails. Simply put, the Act does not remediate any actual, cognizable harm. In addition, it is not narrowly tailored to any supposed harm such as price gouging or other unfair business practices. *See* Part II.A, *infra.*

Even if *Zauderer* provides the appropriate standard, the State cannot overcome NRF's factual allegations, which all support the conclusions that the Act is unjustified and unduly burdensome. The District Court held that the Act was justified by an interest in ensuring consumers are informed about the terms on which products are offered to them. But NRF plausibly alleged that the disclosure is misleading. Similarly, the District Court held that the Act is not unduly burdensome because it does not prevent retailers "from conveying additional truthful information." SPA-20. But NRF plausibly alleged that retailers will be forced to surrender a significant amount of pixel space to the mandatory disclosure, that the Act is broader than necessary since it compels the placement of a damning warning even

alongside discounts, and that the Act is curiously underinclusive by exempting certain speakers altogether—all factors the Supreme Court identifies as evidence of undue burden. *See* Part II.B, *infra.*

*Third*, at a minimum, the District Court erred in dismissing the Complaint with prejudice, rather than permitting NRF to remedy the Complaint's supposed defects. The court faulted NRF for purportedly only vaguely speculating about how consumers might interpret the language of the disclosure. It should have afforded NRF the opportunity to replead to address the court's concerns. *See* Part III, *infra.*

For all of these reasons, the District Court's decision should be vacated and the case remanded with instructions that it proceed or, at a minimum, that NRF may amend its complaint.

## STANDARD OF REVIEW

The District Court's decision to grant a motion to dismiss for failure to state a claim is reviewed de novo. *See, e.g.*, *J.S. v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 76 F.4th 32, 38 (2d Cir. 2023). A motion to dismiss under Rule 12(b)(6) must be denied if a complaint contains sufficient factual matter that, if accepted as true, states a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009). In determining whether the plaintiff has stated such a claim, the Court must assume all well-pleaded factual allegations to be true and draw all reasonable inferences in favor of the plaintiff. *See Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

Even assuming dismissal of the Complaint had been appropriate, the District Court's decision to do so with prejudice is reviewed for an abuse of discretion. *See, e.g.*, *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991). "[R]efusal to grant [leave to replead] without any justifying reason is an abuse of discretion." *Id.*

## ARGUMENT

### I. The District Court Erred By Holding That *Zauderer* Review Applies To NRF's First Amendment Claims.

The District Court held that NRF's challenges to the Act should be subject to the standard of review first set forth in *Zauderer*. That was error twice over. First, the court should have refrained from deciding the level of scrutiny that applies here, as doing so requires deciding disputed questions of fact. Second, the court further erred in rejecting application of (at least) intermediate scrutiny to NRF's allegations.

### A. Determination of what level of scrutiny applies was premature.

The District Court erred in prematurely deciding, at the motion-to-dismiss stage, that the Act qualifies for *Zauderer* review rather than intermediate or strict scrutiny. The court recognized that "[t]he parties do not dispute that the disclosure requirement at issue here is a regulation of speech," and that the Act "therefore triggers at least some form of heightened scrutiny." SPA-7. The court should not have gone on to decide, on the motion to dismiss, that *Zauderer* is "the appropriate level of scrutiny." *Id.* Instead, before dismissing the Complaint, the court should have permitted discovery to inform, for example, whether the compelled disclosure is in fact purely factual and uncontroversial.

"[W]here a plaintiff has adequately alleged that a statute reaches protected speech or expression, determination of the precise form of applicable scrutiny is unnecessary at the pleading stage." *NetChoice v. Brown*, 2025 WL 3267786, at *14 (D. Md. Nov. 24, 2025). "Court[s] generally hold[] First Amendment challenges adequately alleged where the plaintiff has sufficiently alleged that the challenged statute applies to protected speech such that it triggers First Amendment scrutiny." *Id.*; *see also Narce v. Mervilius*, 2023 WL 7128475, at *8 (D.D.C. Oct. 30,

2023) (when "plaintiff has plausibly alleged a viable First Amendment claim" at the motion-to-dismiss stage, "a decision on whether intermediate or strict scrutiny [applies] is not necessary at this stage, where material factual disputes still exist").[5]

Indeed, this Court explained in *Cornelio* that dismissal on a motion to dismiss is "rarely, if ever" warranted when it comes to First Amendment challenges because "factual development will likely be indispensable to the assessment of whether [a law] is constitutionally permissible." 32 F.4th at 172 (quoting *Bruni v. City of Pittsburgh*, 824 F.3d 353, 357 (3d Cir. 2016)).

Thus, in *Volokh v. James*, this Court reversed an order granting a preliminary injunction, but specifically noted that the plaintiff's claims—"that a neutral … Disclosure Requirement would impose disproportionate compliance costs on social media networks based on

[5] *Cf. Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 72 (2d Cir. 1996) (holding, on a preliminary injunction, that the court "need not resolve th[e] controversy" over whether "speech was commercial in nature" where plaintiffs "amply demonstrated that the First Amendment is sufficiently implicated to cause irreparable harm"); *Chamber of Com. of U.S. v. Cal. Air Res. Bd.*, 2024 WL 4683286, at *6–7 (C.D. Cal. Nov. 5, 2024) ("To determine which level of scrutiny to apply, the Court needs a record on whether [the challenged laws] regulate a substantial number of companies that do not make potentially misleading … claims" to determine whether the laws "are appropriately tailored.").

the content of discussions that tend to take place on different sites"—were nonetheless "plausible." 148 F.4th 71, 92 (2d Cir. 2025). Similarly, in *Grocery Manufacturers Association v. Sorrell*, the court denied the plaintiffs' motion for a preliminary injunction while at the same time denying in relevant part the defendants' motion to dismiss, holding that "whether intermediate scrutiny applies to [the] disclosure requirement" at issue is "subject to reasonable debate," and "because the factual record is undeveloped, the court does not dismiss Plaintiffs' First Amendment challenge … at this time." 102 F. Supp. 3d 583, 635 (D. Vt. 2015). So, too, in *Bloch v. Bouchey*, 2023 WL 9058377, at *24 (D. Vt. Dec. 28, 2023), *appeal withdrawn*, 2024 WL 3507743 (2d Cir. Mar. 27, 2024), the court denied a preliminary injunction on a First Amendment claim while denying a motion to dismiss, citing *Cornelio*.

Despite NRF's repeated citations to *Cornelio*, the District Court ignored that case and the principle it stands for. Indeed, although the District Court purported to apply a plausibility standard, in reality its determination of the appropriate level of scrutiny more closely resembles the analysis courts reserve for preliminary injunctions or later stages of the case, when there is a factual record to consider. But

even if NRF failed to meet its burden of showing it was entitled to a preliminary injunction (a decision NRF has not appealed), the same factual questions about, for example, how burdensome the disclosure is—which might prevent a court from issuing a preliminary injunction—should also have prevented the District Court from granting the State's motion to dismiss.

### B. NRF plausibly alleged that at least *Central Hudson* intermediate scrutiny—not *Zauderer*—applies.

Regulations of commercial speech ordinarily are subject to intermediate scrutiny under *Central Hudson*, which requires that the state identify a "substantial" governmental interest that is "directly advance[d]" by the speech restriction and is "not more extensive than necessary." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980). In *Zauderer*, the Court recognized that an exception to that general rule exists when the law at issue requires purely factual and uncontroversial disclosures that seek to correct misleading or deceptive advertising and that do not impose content-based or speaker-based burdens. *Zauderer*, 471 U.S. at 651. The State bears the burden of showing that the requirements for the *Zauderer*

exception are satisfied. *See, e.g.*, *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 776 (2018) (*NIFLA*).

Here, the *Zauderer* exception does not apply, for four independently sufficient reasons: The Act discriminates based on content and speaker; the Act does not address the State's asserted interest in preventing consumer deception; the compelled disclosure is not "purely factual"; and the compelled disclosure is controversial. Accordingly, the Act's disclosure requirement must instead be reviewed under at least intermediate scrutiny pursuant to *Central Hudson*.[6]

[6] NRF preserves the argument that strict scrutiny should apply because the Act arbitrarily singles out some commercial speakers for "differential treatment" based on the subject of their speech. *Reed v. Town of Gilbert*, 576 U.S. 155, 169 (2015); *see also, e.g.*, *R.A.V. v. City of St. Paul*, 505 U.S. 377, 383–90, 391–92 (1992) (holding that even regulations of *unprotected* speech trigger strict scrutiny when they make arbitrary content-based distinctions); *Greater Phila. Chamber of Com. v. City of Philadelphia*, 949 F.3d 116, 139 (3d Cir. 2020) ("We realize, of course, that it may be appropriate to apply strict scrutiny to a restriction on commercial speech that is viewpoint-based."); *Dana's R.R. Supply v. Att'y Gen., Fla.*, 807 F.3d 1235, 1248 (11th Cir. 2015) ("[M]erely wrapping a law in the cloak of 'commercial speech' does not immunize it from the highest form of scrutiny due government attempts to discriminate on the basis of viewpoint."). While NRF believes the application of strict scrutiny here is more faithful to Supreme Court precedent in the area of commercial speech, it recognizes that this Circuit has not applied strict scrutiny in this context.

### 1. The Act discriminates based on content and speaker.

Commercial speech regulations that discriminate based on content and speaker are subject to heightened scrutiny. *See, e.g.*, *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 565 (2011) (*Sorrell*); *Reed*, 576 U.S. at 163.

In justifying the application of *Zauderer* scrutiny rather than intermediate scrutiny, the District Court contended that "restrictions on speech are … treated differently from compelled disclosures." SPA-6. According to the District Court, "*Sorrell*'s concern for 'content-and-speaker-based restrictions' does not translate to the commercial disclosure context." SPA-9 (quoting *Sorrell*, 564 U.S. at 564).

To the contrary, this Court has directed that courts "treat a law compelling—rather than restricting—speech like any other content-based regulation because mandating speech that a speaker would not otherwise make necessarily alters the content of the speech." *Volokh*, 148 F.3th at 84 (cleaned up). This flows from *Sorrell*, in which—c*ontra* the District Court's analysis, SPA-9–10—application of heightened scrutiny did not turn on a disclosure-versus-restriction distinction, but on the fact that the law at issue "[wa]s directed at certain content and … aimed at particular speakers." *Sorrell*, 564 U.S. at 567. As the

Court stressed, "[t]he Constitution 'does not enact Mr. Herbert Spencer's Social Statics.' It does enact the First Amendment." *Id.* (quoting *Lochner v. New York*, 198 U. S. 45, 75 (1905) (Holmes, J., dissenting). Indeed, in *Vugo, Inc. v. City of New York*, on which the District Court relied, SPA-9–10, this Court explained that "the 'upshot' of *Sorrell* is that 'when a court determines commercial speech restrictions are content- or speaker-based, it should then assess their constitutionality under *Central Hudson*.'" 931 F.3d 42, 50 (2d Cir. 2019) (citing *1-800-411-Pain Referral Serv., LLC v. Otto*, 744 F.3d 1045, 1055 (8th Cir. 2014)).

Here, the Act explicitly discriminates based on content and speaker. It excepts from its scope consumer insurance products, consumer financial products, and goods sold under a subscription-based agreement, as well as certain uses of data by delivery and rideshare services. *See* N.Y. Gen. Bus. Law § 349-a(1)(d) & (3). These exclusions mean that some categories of speakers are treated differently than others based on the subject matter of the speech (e.g., whether the retailer is selling auto insurance, meal kits sold under a subscription model, or shampoos for one-time purchase). These facial distinctions

require (at minimum) intermediate scrutiny. *See Sorrell*, 564 U.S. at 563–66, 571 (applying intermediate scrutiny to invalidate law imposing "content-and speaker-based restrictions" on commercial speech").[7]

In *Sorrell*, the Supreme Court held that *at least* intermediate scrutiny applied to a Vermont law barring pharmacies from publishing information to drugmakers for marketing purposes, when that law's exemptions allowed dissemination for other purposes to other recipients. *Id.* at 563–64. As the Supreme Court explained, that law imposed "content-and speaker-based restrictions on the sale, disclosure, and use of prescriber-identifying information"; in particular, it forbade the sale of such information subject to "exceptions based in large part on the content of a purchaser's speech," such as for "those who wish to engage in certain 'educational communications.'" *Id.* Thus, the "law on its face burden[ed] disfavored speech by disfavored speakers." *Id.* at 564.

[7] *See also City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 425 n.20, 429 (1993) (holding that "disparate treatment of two types of commercial speech" is subject to at least intermediate scrutiny); *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 39 (2d Cir. 2018) ("[V]iewpoint discrimination is scrutinized closely whether or not it occurs in the commercial speech context.").

Similarly, in *NIFLA*, the Supreme Court held that at least intermediate scrutiny applied when reviewing the constitutionality of a law requiring some, but not all, licensed crisis pregnancy centers to notify women about the availability of abortion services. 585 U.S. at 762–63, 774–75. The Court emphasized that "[t]he dangers associated with content-based regulations of speech are also present in the context of professional speech" provided to consumers. *Id.* at 771. "As with other kinds of speech, regulating the content of professionals' speech" to consumers "poses the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information." *Id.* (citation and internal quotation marks omitted).

So too here. The Act subjects certain types of consumer-facing businesses to less favorable treatment than other businesses, disfavoring certain speakers and certain kinds of speech. That the Act imposes a speech restriction on advertising for certain goods whose prices are set using an algorithm and exempts others triggers the application of at least intermediate scrutiny. *See Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 618–19, 620 (2020) (plurality op.) (law exempting robocalls from regulation depending on speaker and

message was content-based) (applying *Reed*, 576 U.S. at 169); *U.S. Chamber of Com. v. Lierman*, 151 F.4th 530, 541 (4th Cir. 2025) (at least intermediate scrutiny applies to "'content-based burden[s]' on commercial speech") (citing *Sorrell*, 564 U.S. at 571–72).

The State will likely rely on *CompassCare v. Hochul*, as it did in its motion to dismiss (ECF No. 21 at 13), to argue that a "level of scrutiny resembling rational basis review" applies to *all* required commercial disclosures.[8] 125 F.4th 49, 64 (2d Cir. 2025); *see also* SPA-8–9. Not so. As is clear when the quote is read in context, *CompassCare* simply explains that "not *all* laws compelling speech are subject to strict scrutiny" and, in particular, some mandatory disclosures are subject to *Zauderer* review. 125 F.4th at 63–64 (emphasis added). Plaintiff does not dispute as much. In *CompassCare*, the compelled speech at issue "require[d] an employer who chooses to issue an employee handbook to 'include in the handbook notice of employee rights and remedies under this section.'" *Id.* at 54. The requirement was "content-based" in the

[8] While some cases like *CompassCare* fall back on the label "rational basis" to distinguish *Zauderer* scrutiny from intermediate scrutiny under *Central Hudson*, this Court recently noted that "aspects of the *Zauderer* analysis are arguably more stringent than traditional rational basis review." *Volokh*, 148 F.4th at 85 n.6.

sense that it was triggered by the decision to issue an employee handbook, but it did not treat similarly situated employers differently. Here, by contrast, the Act discriminates between speakers based on the content of their speech, *i.e.*, whether they are advertising a covered good or service or an exempt good or service. The Act thus more closely resembles the laws in *Sorrell* and in *NIFLA*.

The Supreme Court has directed courts to be "deeply skeptical of laws that 'distinguish among different speakers ....'" *NIFLA*, 585 U.S. at 777–78. Because the Act makes facial distinctions between speakers, at least intermediate scrutiny applies.

**2. The Act does not address the State's interest in preventing consumer deception.**

*Central Hudson* also supplies the appropriate standard of review for the independent reason that the Act does not seek to correct misleading or deceptive commercial speech. *Zauderer* applies only when the disclosure is "reasonably related to the State's interest in preventing deception of consumers." *Zauderer*, 471 U.S. at 651. Because the Act undisputedly does not seek to remediate consumer deception, *Central Hudson* applies.

The State *concedes* that the Act is not reasonably related to any interest in preventing consumer deception. ECF No. 21 at 8. Instead, it argues that "*Zauderer* is 'broad enough to encompass nonmisleading disclosure requirements.'" *Id.* (quoting *N.Y. State Rest. Ass'n v. N.Y. City Bd. of Health*, 556 F.3d 114, 133 (2d Cir. 2009) (*NYSRA*)). The District Court agreed, holding that it is enough if the law is "aimed at 'the non-disclosure of information material to the consumer.'" SPA-18 (quoting *Volokh*, 148 F.4th at 87). But the Supreme Court has said otherwise, holding in *Milavetz, Gallop & Milavetz, P.A. v. United States* that *Central Hudson* applies where the advertisements to which the disclosure requirements at issue applied "were not inherently misleading." 559 U.S. 229, 250 (2010); *see id.* at 251 (*Zauderer* applies to regulations designed to mitigate commercial speech with "a tendency to mislead"). This Court has likewise indicated that *Zauderer* is triggered only when the mandatory disclosure is "reasonably related to … preventing deception," *CompassCare*, 125 F.4th at 64, and has, since the Supreme Court's 2010 decision in *Milavetz*, applied intermediate

scrutiny when the disclosure at issue does not involve deception, *see, e.g.*, *Safelite Grp., Inc. v. Jepsen*, 764 F.3d 258, 264 (2d Cir. 2014).[9]

Moreover, even if it were enough for the Act to be "aimed at 'the non-disclosure of information material to the consumer,'" SPA-18, the Complaint plausibly alleges that this particular disclosure, triggered by the most innocuous and common of pricing practices, is *not* material. As alleged by NRF, the use of broadly defined "personal data" to serve discounts to customers is as unsurprising as a gym offering a free class to first-time clients in January. *See, e.g.*, A-3–5 (Compl. ¶¶ 10–15). Put simply, the compelled disclosure does not even give customers *material* information, much less information that prevents consumer deception, and therefore intermediate scrutiny applies.

---

[9] The State cited three cases in the District Court to argue that *Zauderer* extends to non-misleading disclosure requirements: *NYSRA*, 556 F.3d at 133, *National Electrical Manufacturers Association v. Sorrell*, 272 F.3d 104, 115 (2d Cir. 2001) (*NEMA*), and *Poughkeepsie Supermarket Corp. v. Dutchess County*, 648 F. App'x 157, 158 (2d Cir. 2016). *See* ECF No. 21 at 8. Both *NYSRA* and *NEMA* predated the Supreme Court's decision in *Milavetz*. And in *Poughkeepsie Supermarket*, the plaintiff conceded the law was justified by "a rational basis at the time" it was enacted and did not challenge the application of *Zauderer*. *Poughkeepsie Supermkt. Corp. v. County of Dutchess*, 140 F. Supp. 3d 309, 316 (S.D.N.Y. 2015).

### 3. The compelled disclosure is not "purely factual."

As the District Court recognized, the *Zauderer* exception applies only "so long as the required disclosure is of purely factual and uncontroversial information about the goods or services the speaker may offer." SPA-11 (quoting *Volokh*, 148 F.4th at 86); *see Zauderer*, 471 U.S. at 651. The Act's required disclosure is not purely factual.

A statement is not "purely factual" where it is "literally true but nonetheless misleading and, in that sense, untrue." *Wheat Growers*, 85 F.4th at 1276; *accord Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 479 (9th Cir. 2022). Indeed, sometimes "the surest way to convey misinformation is to tell the strict truth." *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 528–29 & n.28 (D.C. Cir. 2015) (internal quotation marks and citation omitted). Whether a compelled disclosure is misleading requires evaluating "the totality of the warning" and its "overall message" in context. *Wheat Growers*, 85 F.4th at 1276–77, 1279.

In *Wheat Growers*, for example, the Ninth Circuit held the warning "glyphosate is known to cause cancer" was not "purely factual" and therefore "d[id] not qualify for the lower level of review under

*Zauderer*" because, even though one working group classified glyphosate as "probably carcinogenic to humans"—which mandated the warning—the "heavy weight of evidence" indicated "that glyphosate is *not* known to cause cancer." *Id.* at 1269, 1273, 1279–80 (emphasis added). As the Ninth Circuit explained, "an ordinary consumer would not understand the nuance between 'known' as defined in the statute"—under which the working group classification sufficed irrespective of other evidence—"and 'known' as commonly interpreted without knowledge of the scientific debate on that subject." *Id.* at 1278.

In the same vein, *Zauderer* itself recognized that ordinary consumers may be misled by a seemingly true factual statement. There, an attorney ran an advertisement stating "if there is no recovery, no legal fees are owed by our clients." 471 U.S. at 652. The Supreme Court recognized that "substantial numbers of potential clients" were likely to be "misled" because clients would still be responsible for litigation *costs*, and "it is a commonplace that members of the public are often unaware of the technical meanings of such terms as 'fees' and 'costs'—terms that, in ordinary usage, might well be virtually interchangeable." *Id.* "[T]o a layman not aware of the meaning of these terms of art, the

advertisement would suggest that employing [the attorney]" would be "entirely free of charge." *Id.*

Here, the Complaint plausibly alleges that the compelled disclosure, like the advertisement in *Zauderer*, is "literally true but nonetheless misleading" in two respects.

*First*, "a reasonable person," *Wheat Growers*, 85 F.4th at 1281, reading that "THIS PRICE WAS SET BY AN ALGORITHM," N.Y. Gen. Bus. L. § 349-a(2), might think that the algorithm somehow calculated the highest price that customer was willing to pay, forcing the customer to pay more than someone else. Not so. In reality, NRF members use data to offer "deals," "discounts," and "promotions," including to "reward customer loyalty"; they generally do not hike prices relative to the baseline. A-13–14 (Compl. ¶¶ 10–11).[10]

---

[10] Indeed, NRF members Logic Product Group LLC, Grill Sergeant, 3 Moms Organics, and Ameribag, all small businesses cited in the Complaint, *see* A-14–15 (Compl. ¶ 14), submitted declarations supporting NRF's motion for a preliminary injunction explaining this at length. *See, e.g.*, A-30, ¶ 6 (3 Moms Organics has "never used consumer data to increase prices, nor would [it] ever do so"); A-43–44, ¶¶ 4, 7–8 (explaining that "the tools [Grill Sergeant] use[s] do not give [it] the option to increase the price for the buyer on [its own] website" and the platforms it sells on also "do not give the seller the option to *increase* the price for the buyer, nor would [it] ever elect such an option"); A-49, ¶ 6 (AmeriBag Products LLC owner testifying that "[w]e have never

*Second*, a reasonable person reading that a price was set "USING YOUR PERSONAL DATA," N.Y. Gen. Bus. L. § 349-a(2), would assume that retailers were collecting, retaining, and exploiting sensitive personal information. In that sense, the disclosure is like the warning in *Wheat Growers* that the Ninth Circuit found not to be "purely factual" because ordinary consumers would not understand what "known" to cause cancer means in that context. Here, "an ordinary consumer would not understand the nuance," *Wheat Growers*, 85 F.4th at 1278, between" "personal data" and "sensitive personal data." As "commonly interpreted," personal data connotes Social Security numbers, medical records, and biometric information—or at least demographic information like age, race, and gender. The disclosure compelled by the Act leaves consumers with an understanding at odds with the reality that the only data a retailer may have about them concerns their prior purchases from that same retailer. In short, the

---

used consumer data to increase prices, nor would we ever do so"); A-52, ¶ 7 (Logic Product Group, LLC, which sells hair, body, and bath products, has "never used consumer data to increase the price for any customers, nor would [it]"). This further illustrates how inappropriate it was for the District Court to dismiss NRF's Complaint at the motion-to-dismiss stage, without affording it the opportunity to put forth a factual showing of the validity of its claims.

disclosure's references to both setting prices and "personal data" *creates* confusion, rather than dispels it.

The District Court dismissed NRF's allegations that the disclosure would cause confusion to the ordinary consumer as "entirely speculative." SPA-13. But, again, *Zauderer* itself is instructive. It held that "[t]he assumption that substantial numbers of potential clients would be so misled" by the literally true advertisement at issue there "[wa]s hardly a speculative one," and that "[w]hen the possibility of deception is as self-evident as it is in this case, we need not require … 'a survey of the public before … determin[ing] that the [advertisement] had a tendency to mislead.'" 471 U.S. at 652–53 (cleaned up) (quoting *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 391–92 (1965)). NRF's allegations about how consumers will react are, even if not "self-evident," at least plausible and must be credited on a motion to dismiss, so that NRF has an opportunity to introduce such a "survey of the public" into evidence. *Id.*; *see In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993) (whether nondisclosure of fact renders original disclosure misleading was not suitable for decision on the pleadings); *Brooklyn Branch of NAACP v. Kosinski*, 657 F. Supp. 3d 504, 524

(S.D.N.Y. 2023) (how message will be perceived "is a fact question that cannot be resolved on a motion to dismiss"); *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 469–70 (S.D.N.Y. 2020) (same); *Brady v. Anker Innovations Ltd.*, 2020 WL 158760, at *9 n.9 (S.D.N.Y. Jan. 13, 2020) (same).

#### 4. The compelled disclosure is controversial.

Finally, the compelled disclosure does not qualify for *Zauderer* review because it is not "uncontroversial." *Zauderer*, 471 U.S. at 651. A message is controversial under *Zauderer* if it forces the speaker to take sides in a public debate. Thus, in *NIFLA*, the Supreme Court declined to apply *Zauderer* when the compelled disclosure required a business "to convey a message fundamentally at odds with its mission." *CTIA v. City of Berkeley*, 928 F.3d 832, 845 (9th Cir. 2019) (citing *NIFLA*, 585 U.S. at 769). NRF alleges that the Act does just that: It requires businesses that use algorithmic technologies to enter the robust public debate about whether those technologies are harmful, and to credit an insinuation that they are through the application of an ominous-sounding warning. A-13, 18–20, 23 (Compl. ¶¶ 10, 23–26, 35).

The District Court committed two errors in holding such allegations insufficient. *First*, the District Court's statement that NRF "makes no more than a conclusory assertion that the topics of 'machine learning, algorithms, and artificial intelligence' in general, or algorithmic pricing in particular, are 'controversial' in any meaningful way," SPA-16, is belied by the Complaint and the documents incorporated by reference therein. The Complaint cites an article in Politico, for example, *see* A-17 (Compl. ¶ 21 n.5), which noted the growing "concern over personalized pricing" among certain lawmakers, and the pushback from companies "arguing that they use people's data to offer *lower* prices" and that restricting the use of personalized pricing "would hurt consumers during a time of economic uncertainty by preventing targeted discounts."[11] Likewise, studies cited in the Complaint reflect the controversial nature of algorithmic pricing, with one study, for instance, describing "[t]he current debate around personalized pricing,"[12] and another noting that "[p]rice discrimination is widely considered unethical/unfair by consumers," contrary to the

[11] Alfred Ng, *The fight over unfair pricing goes national*, POLITICO (May 28, 2025), https://perma.cc/JH9G-LZX5.

[12] Gonzaga et al., *supra*, n.3, (cited at A-15 (Compl. ¶ 15 n.2)).

authors' finding that price discrimination may be "*more* ethical than unitary pricing."[13] Thus, at the pleading stage—where factual allegations must be taken as true—NRF sufficiently alleged that the use and regulation of algorithmic pricing are the subject of considerable controversy.

*Second*, the District Court beat a straw man in holding that a disclosure is not controversial "merely because the regulated entity does not wish to make that disclosure or because they would prefer to make a different statement on that same topic." SPA-15. NRF does not contend that a disclosure is controversial any time "the regulated entity does not wish to make that disclosure." To the contrary, NRF recognizes that businesses may be required to tell consumers that facts "*are what they are*," *Volokh*, 148 F.4th at 90—for example, when it comes to posting calorie counts, *NYSRA*, 556 F.3d at 134, notifying employees about rights inscribed in the law, *CompassCare*, 125 F.4th at 66, or even disclosing prices of retail goods, *Poughkeepsie Supermkt. Corp.*, 648 F. App'x at 157–58. But the compelled disclosure here is far

[13] Jerod Coker & Jean-Manuel Izaret, *Progressive Pricing: The Ethical Case for Price Personalization*, 173 J. BUS. ETHICS 387 (2021), https://perma.cc/SYE7-CCZQ.

different. It implies that retailers' business practices are exploitative, invasive, and suspect. By analogy, if a law required farmers to include a label stating that the produce they sell was "not harvested by American labor," that law would force farmers to wade into the public debate about immigration and citizenship and espouse a message implying that "non-American" labor, whatever that is, is dangerous or suspect. So, too, here: The Act forces retailers to wade into the public debate over whether algorithmic pricing is welfare-enhancing or insidious and to espouse a message implying that customers should fear any use of their personal data to set prices. A law that forces retailers to make statements that implicate and inflame a lively ongoing debate is far from uncontroversial and is not entitled to *Zauderer* scrutiny.

## II. NRF Plausibly Alleged That The Act Fails First Amendment Scrutiny.

Irrespective of the level of heightened scrutiny that applies, the District Court erred in concluding that the Act survives First Amendment review.

For starters, the District Court erred in deciding whether the applicable level of scrutiny was satisfied at the motion-to-dismiss stage without the benefit of a factual record. Whether an ordinance satisfies

heightened scrutiny is an "extremely fact-specific analysis." *Brewer v. W. Irondequoit Cent. Sch. Dist.*, 212 F.3d 738, 753 (2d Cir. 2000), *superseded on other grounds*. In particular, "[t]he legislature's rationale for the law and the fit of the law to the relevant social problem are factual questions that the Court [should] address at later stages of litigation." *Nat'l Inst. of Fam. & Life Advocs. v. Clark*, 737 F. Supp. 3d 246, 263 (D. Vt. 2024). "For that reason, 'the norm is to wait until the summary judgment stage of the litigation to address the ultimate question of whether the ordinance should stand.'" *Cornelio*, 32 F.4th at 172 (quoting *Graff v. City of Chicago*, 9 F.3d 1309, 1322 (7th Cir. 1993)).

Even setting aside that fundamental error, the District Court's conclusion that the law survives review is also wrong. There is little question that the Act fails intermediate scrutiny. And the court's conclusion that the Act survives *Zauderer* review was possible only because the court discounted NRF's plausible allegations that the disclosure misleads consumers, that consumers benefit rather than suffer from algorithmic pricing, and that retailers are forced to sacrifice their own speech to make room for the State's preferred message, and

because the court provided NRF no opportunity to develop the facts to prove those allegations.

### A. Dismissal was inappropriate assuming intermediate scrutiny applies to the Act.

Crediting the plausible allegations in the Complaint, the Act fails intermediate scrutiny and is unconstitutional. Intermediate scrutiny requires the State to show it has (1) a real, non-speculative, and substantial state interest (2) that the Act directly and actually advances, and that (3) the Act regulates no more speech "than necessary to achieve" that interest. *IMS Health Inc. v. Sorrell*, 630 F.3d 263, 275 (2d Cir. 2010), *aff'd*, 564 U.S. 552 (2011) (citing *Central Hudson*, 447 U.S. at 564). NRF has pled facts that, if proven, would establish the Act does not meet any of these three requirements.

*First*, the State has not identified a substantial government interest advanced by the Act—in the text of the Act, in the Act's almost-nonexistent legislative history, or in the State's motion to dismiss. As the Complaint alleges, the legislature held no substantive hearings, and the Act was not predicated on any factual findings about actual consumer injury. A-22 (Compl. ¶ 32). Rather than build a legislative record and deliberate over the soundest approach to remediate any

actual consumer injury, the legislature was apparently "driven by transparency goals untethered from any evidence of real, cognizable harms or of actual consumer deception." A-23 (Compl. ¶ 36).

The closest thing to an explanation for the Act is contained in the "initial findings" of Federal Trade Commission staff about a 2025 FTC study,[14] which was cited in the "Senate Introducer's Memo" to a version of the bill. *See* ECF No. 21 at 3 (citing S.B. S7033, Senate Introducer's Memo (N.Y. 2025) https://www.nysenate.gov/legislation/bills/2025/S7033)); *see also* A-17 (Compl. ¶ 21 n.4) (discussing study). That study suggested that FTC staff were worried about "[c]ompanies that collect or obtain individualized information about their actual or potential customers … potentially us[ing] a variety of features to target prices to specific consumers and *charge particular groups higher prices* …." *Id.* (emphasis added).[15]

---

[14] *See* FTC, *FTC Surveillance Pricing 6(b) Study: Research Summaries, A Staff Perspective* (Jan. 2025) (*FTC Study*), at 1 https://perma.cc/CM65-8N59.

[15] The FTC Study cited as an example "if a consumer is profiled as a new parent" and is then "intentionally … shown higher priced baby thermometers." *FTC Study* at 5.

Notably, that consumer-protection interest is not the interest the State advanced in its motion to dismiss (and as discussed below at pp. 45–46, is not an interest the Act in fact addresses). Rather, the State tried to defend the Act retrospectively by invoking an interest in "helping consumers make informed decisions regarding products and services that are priced using algorithms." ECF No. 21 at 11. But the "justification" for a law subject to heightened scrutiny "must be genuine" at the time the law is enacted, "not hypothesized or invented post hoc in response to litigation." *United States v. Virginia*, 518 U.S. 515, 516 (1996).

In any event, "helping consumers make informed decisions" is nothing more than the "consumer curiosity" that this Court has held insufficient "to sustain the compulsion of even an accurate, factual statement." *Int'l Dairy Foods*, 92 F.3d at 74. The District Court reasoned that "the disclosure here reasonably bears on the 'final product' and therefore rises above mere gratification of 'consumer curiosity.'" SPA-24–25 (citing *NEMA*, 272 F.3d at 115 and *NYSRA*, 556 F.3d at 134). But the State's vague asserted interest in "helping consumers make informed decisions" far more closely resembles the

interest in satisfying "consumer curiosity" held insufficient in *International Dairy Foods* than it does the concrete interests in preventing mercury poisoning and obesity advanced by the laws at issue in *NEMA* and *NYSRA*, respectively.

*Second*, even assuming the State could show a real and substantial interest in something concrete like preventing price gouging or discrimination, the Act does not directly and materially advance any such interest. *See Edenfield v. Fane*, 507 U.S. 761, 773 (1993) (commercial speech regulations must be proven "effective"). New York laws already prohibit improper discrimination in pricing, price gouging, and unfair business practices. *See* A-11, 13–14 (Compl. ¶¶ 2, 11) (citing N.Y. Civ. Rights Law § 40-C (discrimination), N.Y. Gen. Bus. Law § 396-r (price gouging), and N.Y. Gen. Bus. Law § 349 (unfair business practices)). And because the disclosure is not triggered by the use of any particular consumer data, or by the use of such data to increase prices, the Act does not directly or effectively advance any state interest in preventing price gouging based on sensitive personal information.

The Act is further undermined by its significant exemptions. *See* N.Y. Gen. Bus. Law § 349-a(1)(d), (3). Legislation seriously concerned

with the abuse of sensitive personal data would not exempt classes of businesses—like banks and insurance companies—*especially likely* to collect and potentially misuse such data, while applying to mom-and-pop retailers who sell things like bug spray (3 Moms Organics) and grilling tools (Grill Sergeant). *See* A-14–15 (Compl. ¶ 14). A law that exempts important sources of the putative problem the government seeks to avert does not "materially advance its aim." *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 489 (1995) (regulating labels on some alcoholic beverages but not others failed intermediate scrutiny); *see also Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 190 (1999) (regulation applicable to some casino advertisements but not others was "so pierced by exemptions and inconsistencies that the Government cannot hope to exonerate it"). The State must demonstrate a rational connection between the exempted speech and the Act's goals. *See Discovery Network*, 507 U.S. at 418–19 (banning news racks for commercial handbills but not newspapers was irrational and would yield "minimal impact"). The State cannot.

*Third*, the Act's regulation of commercial speech is "more extensive than necessary to achieve" any putative consumer protection

interest the State may have. *IMS Health Inc.*, 630 F.3d at 275. While protecting consumers from price-gouging or discriminatory pricing based on a protected characteristic like pregnancy status—if that were the government's aim, *see supra* n.15—may be a legitimate government interest, the law applies even to discounts based on impersonal information, which NRF plausibly alleged comprise the vast majority of the Act's applications. A-13–16, 19 (Compl. ¶¶ 10–15, 15 n.1 & n.2, 19, 25). "[T]he disclosure requirement" therefore "plausibly appears to be overbroad." *Cornelio*, 32 F.4th at 175.

Because "more direct, less speech-restrictive means" of preventing price gouging and exploitation of sensitive personal data are available—including relying on existing laws or requiring a disclosure only when certain kinds of data are used to increase prices—the Act fails intermediate scrutiny. *IMS Health*, 630 F.3d at 280; *see also N.Y. State Ass'n of Realtors, Inc. v. Shaffer*, 27 F.3d 834, 844 (2d Cir. 1994) (law failed intermediate scrutiny because government failed to demonstrate inadequacy of alternatives).

### B. NRF plausibly alleged that, even if *Zauderer* were the proper standard, the Act does not satisfy that standard.

Even if the District Court were correct in subjecting the Act to *Zauderer* rather than intermediate scrutiny, the court nonetheless erred in holding that the Act passes constitutional muster.

While paying lip service to this Court's recognition that *Zauderer* may be "better characterized as a special and more relaxed application of intermediate scrutiny," SPA-5–6 n.1, the District Court in effect applied ordinary rational basis review. But as now-Justice Kavanaugh has explained, *Zauderer* is "far more stringent than mere rational basis review." *Am. Meat Inst. v. USDA*, 760 F.3d 18, 33 (D.C. Cir. 2014) (Kavanaugh, J., concurring); *accord Volokh*, 148 F.4th at 85 n.6.

Regardless of how *Zauderer* is categorized, the State's burden is not merely to identify any logical connection between the Act and the State's interests; it must show that the Act is (a) not "unjustified" and (b) not "unduly burdensome." *NIFLA*, 585 U.S. at 776 (cleaned up). The District Court did not correctly apply this test. The first part of that test—justification—is identical to what intermediate scrutiny requires: a disclosure must "remedy a harm that is … 'not purely hypothetical.'"

*Id.* at 776–77 (citation omitted). Indeed, Justice Breyer dissented in *NIFLA*, criticizing the binding majority opinion for interpreting *Zauderer* to impose this "searching standard" that mirrors intermediate scrutiny. *Id.* at 799 (Breyer, J., dissenting). The test departs from intermediate scrutiny *only* in relaxing the "narrow tailoring" requirement to an "unduly burdensome" standard—but a compelled disclosure is unduly burdensome if it extends "broader than reasonably necessary," "drowns out" a speaker's own message, or targets a "curiously narrow subset of speakers." *Id.* at 776–78.

NRF has plausibly alleged that the Act is both unjustified and unduly burdensome and therefore fails *Zauderer* review.

**1. The Act is "unjustified."**

*Zauderer* requires the State to show that the law will remedy a potentially real, "not purely hypothetical," harm. *Id.* at 776–77. NRF plausibly alleges that the State has not and cannot do so.

The District Court held that the Act's justification was not hypothetical because, "by plaintiff's own admission, its members use personalized algorithmic pricing, including for the purpose of offering different prices to different consumers." SPA-23. But a law cannot be

justified by "simply 'posit[ing] the existence of the disease sought to be cured.'" *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994) (citation omitted). NRF plausibly alleges that the Act contains no findings of consumer deception or other harm from algorithmic pricing, nor is there a legislative record reflecting a real consumer injury.

In fact, the academic literature, incorporated by reference in Plaintiff's Complaint, shows that algorithmic pricing tends to *lower* prices for consumers. *See* A-15 (Compl. ¶ 15); *supra* pp. 9–10. And the FTC Study on which the State relies contains only the FTC staff's "initial observations" and "[r]esearch [s]ummaries," *FTC Study*, *supra*, and underscores the hypothetical nature of the State's concerns, *see* ECF No. 21 at 11 (State describing the FTC Study as positing that "algorithmic pricing *can* lead to consumers … *potentially* being subjected to discriminatory pricing") (emphases added).

At best, the State's justification boils down to seeking to satisfy "consumer curiosity." But that interest is not sufficient under *Zauderer* "to sustain the compulsion of even an accurate, factual statement." *Int'l Dairy Foods*, 92 F.3d at 74.

This case is thus like *NIFLA*. In *NIFLA*, the Court considered not only the constitutionality of the licensed clinic disclosure discussed above (at p. 27), to which the Court held that at least intermediate scrutiny applied, but also the constitutionality of another disclosure requiring unlicensed clinics to notify women that they were not licensed to provide medical services. 585 U.S. at 764–65. As to that disclosure, the Court held that it "need not decide whether the *Zauderer* standard applies" because "[e]ven under *Zauderer*," the unlicensed provider disclosure requirement was unconstitutional: California "point[ed] to nothing suggesting that pregnant women do not already know that the covered facilities are staffed by unlicensed medical professionals," and thus could not show the law was justified. *Id.* at 776–77.

Likewise, in *Ibanez v. Florida Department of Business & Professional Regulation, Board of Accountancy*, the Supreme Court held unconstitutional a law requiring certified financial planners to disclose that they were accredited by a private organization because there was no evidence the public might otherwise be harmed. 512 U.S. 136, 145 (1994); *see also Hayes v. N.Y. Att'y Grievance Comm.*, 672 F.3d 158, 167

(2d Cir. 2012) (applying *Ibanez* to invalidate compelled disclosure for similar reason).

So too here. Nothing in the Act reflects evidence the public would be harmed in any way absent a disclosure about the use of what the legislature has broadly labeled "algorithmic pricing" using "personal data." Because the legislature failed to identify any actual consumer harm, and any harm resulting from the use of personalized algorithmic pricing is "purely hypothetical," *NIFLA*, 585 U.S. at 776, the Act fails *Zauderer*'s justification requirement.

**2. The Act is "unduly burdensome."**

The Act also fails *Zauderer* scrutiny because the mandated disclosure is unduly burdensome. Under *Zauderer*, a disclosure requirement cannot be "unduly burdensome"—that is, it cannot extend more "broad[ly] than reasonably necessary"; "drown[] out" a covered speaker's message; or target a "curiously narrow subset of speakers" such that the disclosure is "wholly disconnected from" the regulator's "informational interest." *NIFLA*, 585 U.S. at 776–78. The Act violates all three of these principles.

*First*, the Act extends more "broad[ly] than reasonably necessary" by requiring the disclosure even when only non-sensitive data is being used and even when personal data is being used only to lower prices. *See supra* pp. 46–47.

*Second*, as alleged in the Complaint, the Act forces retailers to sacrifice their own preferred speech given the limited pixel space everywhere prices are displayed. *See* A-20 (Compl. ¶ 27). The District Court should have accepted this allegation as true and permitted the parties to introduce evidence regarding ad placement in the ecommerce context.

The District Court instead discredited those allegations, asserting without basis that "online 'pixel space' … by its nature is not so space-limited as the traditional print advertising on which disclosure requirements have consistently been upheld" and that the required disclosure will leave retailers free to communicate any message of their choosing. SPA-27. But this is a factual determination directly contradicted by the allegations in the Complaint. *See Melendez v. City of New York*, 16 F.4th 992, 1040, 1042 (2d Cir. 2021) (whether ordinance alleged to burden constitutionally protected rights used "reasonable and

appropriate means" was fact question that could not be decided "at the pleadings stage").

As this Court emphasized in *Volokh*, the Court should not "embrac[e] any particular supposition as to the empirical effect of a neutral disclosure requirement." 148 F.4th at 92. If that is so even at the preliminary injunction stage, as in *Volokh*, it must certainly be true at the motion to dismiss stage, when the Court must take all factual allegations as true. The District Court should not have waved away the Act's constraining effect on retailers' ability to convey their own preferred message.

*Third*, the Act targets a "curiously narrow subset of speakers," by exempting insurance companies and financial institutions that sell perhaps the most consequential consumer products and routinely rely on sensitive personal data like income. *NIFLA*, 585 U.S. at 776–78; *see also* A-11 (Compl. ¶ 2) ("The Act arbitrarily exempts retailers in large sectors of the consumer economy, without any findings to support that distinction."); A-17 (Compl. ¶ 20) (describing exemptions "that seemingly bear no logical connection to each other or the Act's ostensible purpose"). Like the unlicensed clinic notice requirement at

issue in *NIFLA* that exempted some federally funded providers but applied to others, the Act with its irrational "speaker-based" exemptions fails *Zauderer*. *NIFLA*, 585 U.S. at 777.

In sum, the Complaint plausibly alleged that the Act is unjustified and unduly burdensome because it extends more broadly than necessary, drowns out retailers' own preferred speech, and targets only an arbitrary subset of speakers. The District Court thus erred in holding that the Act survives *Zauderer* review even were such review appropriate.

## III. At A Minimum, The District Court Abused Its Discretion In Dismissing With Prejudice.

The District Court compounded its errors when it not only dismissed the Complaint, but did so with prejudice. SPA-28. The court's unexplained failure to allow NRF to amend its Complaint was an abuse of discretion.

"When a motion to dismiss is granted, 'the usual practice is to grant leave to amend the complaint.'" *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198–99 (2d Cir. 1990) (quoting 2A Moore & Lucas, MOORE'S FEDERAL PRACTICE ¶ 12.14 at 12-99 (2d ed. 1989)). Dismissal *without* prejudice is critical because, "[w]ithout the benefit of a ruling, many a

plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015).

Moreover, when courts deny plaintiffs an opportunity to replead, they must do so "based on a valid ground." *Ronzani*, 899 F.2d at 198. This Court has thus repeatedly vacated and remanded district court decisions dismissing complaints without leave to replead where—as here—the district court did so "without any justifying reason." *Pavone v. Puglisi*, 353 F. App'x 622, 626 (2d Cir. 2009). "Although leave to replead is within the discretion of the district court, refusal to grant it without any justifying reason is an abuse of discretion." *Schindler v. French*, 232 F. App'x 17, 19 (2d Cir. 2007) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991)).[16]

The trial court ignored these principles when it dismissed with prejudice, without NRF having ever had an opportunity to amend, and

---

[16] *See also, e.g.*, *Volvo N. Am. Corp. v. Men's Int'l Pro. Tennis Council*, 857 F.2d 55, 75 (2d Cir. 1988) (same); *Foman v. Davis*, 371 U.S. 178, 182 (1962) (dismissing with prejudice "without any justifying reason appearing" for not permitting amendment "is not an exercise of discretion" and is "inconsistent with the spirit of the Federal Rules").

without providing any explanation as to the basis for its dismissal with prejudice. Importantly, the District Court's principal basis for dismissal was precisely the kind of purported pleading defect that can be cured by amendment. The court held that NRF failed to plausibly allege that ordinary consumers would find the compelled disclosure misleading, stating that NRF "merely speculates that the overall statement" gives consumers the impression that price-setting algorithms are dangerous, increase prices for consumers, and/or involve non-consensual and invasive collection of sensitive personal data. SPA-12–13.[17] If given an opportunity to replead, NRF could easily cure this purported flaw. NRF could, for example, plausibly allege that the Act's definition of "personal data" includes a variety of information that consumers do not consider confidential, New York General Business Law § 349-a(1)(d), (f), whereas the ordinary meaning of that term generally refers to confidential

[17] *See* SPA-13 ("The Court notes that plaintiff's assertions about how consumers will react to the disclosure are entirely speculative."); *id.* at n.4 (stating the affidavits from retailers "do not rise above the level of speculation or conjecture about how consumers will react to the mandated disclosure"); SPA-14 (NRF "speculat[es] that because" "the terms 'personal data' and 'algorithm'" "are 'undefined' they will 'falsely imply that the price to which that disclosure is attached is exploitative and based on sensitive personal information, even when it is not'").

information.[18] The disclosure is therefore misleading. NRF could also introduce findings from consumer surveys proving how consumers understand and interpret the words of the compelled disclosure.

The trial court also faulted NRF for failing to plausibly allege that the statute is not aimed at remedying any bona fide harm, *see* SPA-23–24, or that the mandatory disclosure will interfere with retailers' ability to freely speak their own messages, *see* SPA-26–27. Those pleading defects, too, could be remedied in an amended complaint.

Thus, even if this Court were to agree with the District Court's decision dismissing NRF's Complaint—notwithstanding the numerous errors identified above—at a minimum NRF should be given another opportunity to plead its First Amendment claim.

## CONCLUSION

The Court should reverse the District Court's grant of the State's motion to dismiss and remand for further proceedings or, in the

---

[18] *See, e.g.*, *Personal data,* Oxford English Dictionary, https://perma.cc/DSY4-KE8V (last visited Oct. 22, 2025) ("personal information about an individual; now *esp*. confidential information about someone's finances, medical history, etc., that is stored electronically"); *Personal data*, Cambridge Dictionary, https://perma.cc/NDV8-D9UA (last visited Jan. 6, 2026) ("information held on computers that relates only to you, and that you do not want everyone to know").

alternative, reverse and remand with instructions that NRF be permitted to amend its Complaint.

Respectfully submitted,

*<u>/s/ David M. Gossett</u>*

Ambika Kumar
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104
(206) 622-3150
ambikakumar@dwt.com

Alexandra Perloff-Giles
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas,
42nd Floor
New York, NY 10020-1104
(212) 489-8230
alexandraperloffgiles@dwt.com

David M. Gossett
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, DC 20005
(202) 973-4200
davidgossett@dwt.com

Adam S. Sieff
DAVIS WRIGHT TREMAINE LLP
350 S. Grand Avenue, 27th Floor
Los Angeles, CA 90071-3487
(213) 633-6800
adamsieff@dwt.com

*Counsel for Plaintiff-Appellant National Retail Federation*

January 6, 2026

## CERTIFICATE OF SERVICE

On January 6, 2026, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court.

/s/ *David M. Gossett*
David M. Gossett

## CERTIFICATE OF COMPLIANCE

(1) This brief complies with the type-volume limitation of Local Rule 32.1(4)(A) because it contains 11,529 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

(2) This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word (the same program used to calculate the word count).

*/s/ David M. Gossett*
David M. Gossett

# SPECIAL APPENDIX

## TABLE OF CONTENTS

**Page**

Opinion and Order of the Honorable Jed S. Rakoff, dated October 8, 2025, Appealed From .................................. SPA-1

Algorithmic Pricing Disclosure Act, N.Y. Gen. Bus. Law § 349-a ............... SPA-29

Constitution of the United States – First Amendment ............................... SPA-31

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL RETAIL FEDERATION,<br><br>Plaintiff,<br><br>-v-<br><br>LETITIA JAMES, in her official capacity as Attorney General of New York,<br><br>Defendant. | 25-cv-5500 (JSR)<br><br>OPINION AND ORDER |

JED S. RAKOFF, U.S.D.J.:

Plaintiff National Retail Federation challenges a recently enacted New York State law that requires merchants to disclose when a published price has been set by algorithm using a consumer's personal data. See N.Y. Gen. Bus. Law § 349-a (McKinney 2025). Plaintiff alleges that the disclosure requirement violates the First Amendment's prohibition on compelled speech.

Now before the Court are two motions: plaintiff's motion for a preliminary injunction and defendant's motion to dismiss. For the reasons set forth below, the Court concludes that plaintiff has not plausibly alleged that the challenged disclosure requirement runs afoul of the First Amendment. The Court therefore grants the motion to dismiss and, for the same reasons, denies the request for a preliminary injunction.

## I. Background

Where relevant, facts are drawn from the complaint and accepted as true for the purposes of the motion to dismiss. Anemone v. Metropolitan Transp. Auth., 410 F. Supp. 2d 255, 261 (S.D.N.Y. 2006).

### A. The Algorithmic Pricing Disclosure Act

On May 9, 2025, the New York state legislature enacted the Algorithmic Pricing Disclosure Act ("the Act") as part of an omnibus budget bill. See 2025 N.Y. Sess. Laws Ch. 58, Pt. X (S. 3008-C). As relevant here, the Act provides that any entity domiciled or doing business in New York that

> sets the price of a specific good or service using personalized algorithmic pricing, and that directly or indirectly, advertises, promotes, labels or publishes a statement, display, image, offer or announcement of personalized algorithmic pricing to a consumer in New York, using personal data specific to such consumer, shall include with such statement, display, image, offer or announcement, a clear and conspicuous disclosure that states: "THIS PRICE WAS SET BY AN ALGORITHM USING YOUR PERSONAL DATA."

N.Y. Gen. Bus. Law § 349-a(2).

The Act defines "personalized algorithmic pricing" as "dynamic pricing set by an algorithm that uses personal data," which the Act further defines as "any data that identifies or could reasonably be linked, directly or indirectly, with a specific consumer or device." Id. § 349-a(1)(d), (f). The Act excludes from this definition location data used by a "for-hire" or "transportation network company" vehicle to calculate a passenger's fare based on mileage and travel time. Id. The Act also excludes from its coverage entities that are regulated under state insurance law and certain regulated financial

institutions, as well as discounted prices offered to consumers under "existing subscription-based agreement[s]." Id. § 349-a(3).

To fulfill the Act's disclosure obligation, a merchant must publish the required disclosure "in the same medium as" and "on, at or near and contemporaneous" with the announcement of the price, "using lettering and wording that is easily visible and understandable to the average consumer." Id. § 349-a(1)(b).

The Act is enforceable only by the New York State Attorney General, who must first issue a "cease and desist letter . . . specifying the alleged violation or violations" and setting forth a timeline to cure the violation. If the violation is not remedied, the Attorney General may seek a judicial injunction, as well as civil penalties of up to $1000 per violation. Id. § 349-a(4).

**B. Procedural History**

On July 2, 2025, plaintiff National Retail Foundation filed this suit, alleging that the Act's disclosure requirement violates the First Amendment. See generally Complaint, ECF No. 1. The complaint named Letitia James, the New York State Attorney General, as defendant. That same day, plaintiff also moved for a preliminary injunction against the Act's enforcement. See ECF No. 9.

Plaintiff is a retail trade association whose "members use price-setting technologies covered by the Act" to publish prices to consumers in New York and who are therefore "subject to its [disclosure] requirement." Compl. ¶ 5; see also id. ¶¶ 10-14 (describing plaintiff's members' use of pricing algorithms to "offer

promotions, adjust pricing, and reward consumer loyalty"). Plaintiff argues that the Act "compels a broad range of retailers," including its members, "to express a misleading and controverted government-scripted opinion without justification" and that it therefore violates its members' First Amendment rights. Id. ¶¶ 2, 28-36.

Subsequently, the Court granted the parties' application to set a joint briefing schedule for plaintiff's preliminary injunction motion and for defendant's anticipated motion to dismiss. See ECF No. 13. Defendant also agreed to stay enforcement of the Act until 30 days after the Court rules on the preliminary injunction motion, and to not retroactively enforce the Act for any alleged violations that occur before the end of that period. See ECF No. 16.

Defendant then moved to dismiss the action, arguing that plaintiff fails to state a cognizable First Amendment claim because the Act is subject to, and passes muster under, so-called Zauderer review. See Zauderer v. Off. of Disciplinary Counsel, 471 U.S. 626 (1985); Memorandum of Law in Support of Defendant's Motion to Dismiss the Complaint, ECF No. 21 ("MTD").

Both the motion to dismiss and the preliminary injunction motion have now been fully briefed and argued and are ripe for resolution. Because the Court grants the motion to dismiss and enters judgment dismissing the action, it need not separately address plaintiff's motion for a preliminary injunction. See Bryant v. New York State Educ. Dep't, 692 F.3d 202, 219 (2d Cir. 2012) (if a party cannot

sustain any of its claims for relief, it necessarily cannot satisfy the requirements for a preliminary injunction).

## II. Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Legal conclusions and conclusory or speculative assertions are not to be taken as true.

## III. Discussion

### A. First Amendment Framework

Just as the First Amendment limits the government's power to restrict expression, it also curtails its power to compel speech. See Volokh v. James, 148 F.4th 71, 84 (2d Cir. 2025). To determine whether a particular law runs afoul of these limits, courts employ different levels of judicial scrutiny, depending on the type of expression and the nature of the restriction at issue. Id.

On the whole, laws regulating commercial speech are subject to a less-exacting standard of review than are laws regulating other forms of speech. See Nat'l Elec. Mfrs. Ass'n v. Sorrell (NEMA), 272 F.3d 104, 113 (2d Cir. 2001); see also Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York, 447 U.S. 557, 562-63 (1980) ("The Constitution . . . accords a lesser protection to commercial speech than to other constitutionally guaranteed expression."). Under this

umbrella, restrictions on speech are also treated differently from compelled disclosures.

A law that prohibits or restricts commercial speech must survive so-called "intermediate" scrutiny in order to pass constitutional muster. See Central Hudson, 447 U.S. at 566. This means that the regulation must "directly advance[] a substantial governmental interest" and must not be "overly restrictive." Safelite Grp., Inc. v. Jepsen, 764 F.3d 258, 261 (2d Cir. 2014). By contrast, a law that requires the disclosure of "'purely factual and uncontroversial information' about the goods or services the speaker may offer" is governed by the more permissive Zauderer standard of review. Volokh, 148 F.4th at 85-86 (quoting Zauderer, 471 U.S. at 651). Under Zauderer, a commercial disclosure law does not offend the Constitution so long as it is "'reasonably related to the state's interest in preventing deception of consumers,' and [is] not 'unjustified or unduly burdensome.'" Id. at 85 (quoting Zauderer, 471 U.S. at 651).[1]

Under Zauderer, the fact that First Amendment scrutiny applicable to commercial disclosure requirements is relatively "relaxed" follows from the fact that the First Amendment protection afforded commercial

---

[1] Although the Second Circuit "has often described scrutiny under Zauderer as 'rational basis' review," it recently declined to settle whether the Zauderer standard "is tantamount to traditional or perhaps more rigorous rational basis review, or whether it is better characterized as a special and more relaxed application of intermediate scrutiny." Volokh, 148 F.4th at 85 n.6. What is clear is that Zauderer is in all events "more relaxed than ordinary intermediate or strict scrutiny." Id. Accordingly, following the Second Circuit's lead, the Court simply refers to "Zauderer scrutiny."

speech "is justified principally by the value to consumers of the information such speech provides." Id. at 86-87 (quoting Zauderer, 471 U.S. at 651). Accordingly, a seller's First Amendment "interest in not providing any particular factual information in his advertising is minimal." Id. (emphasis omitted) (quoting Zauderer, 471 U.S. at 651). Moreover, unlike a "flat prohibition[] on [commercial] speech," disclosure requirements "trench much more narrowly" on sellers' First Amendment interests because they do not prevent sellers from conveying any message of their own but merely require them "to provide somewhat more information than they might otherwise be inclined to present." Id. at 650; see also NEMA, 272 F.3d at 113-14 ("Commercial disclosure requirements are treated differently from restrictions on commercial speech because mandated disclosure of accurate, factual, commercial information does not offend the core First Amendment values of promoting efficient exchange of information or protecting individual liberty interests.").

**B. Level of Scrutiny**

The parties do not dispute that the disclosure requirement at issue here is a regulation of speech and therefore triggers at least some form of heightened judicial scrutiny. The parties disagree, however, about the appropriate level of scrutiny.

Defendant argues that the Act should be subject to Zauderer review because it mandates the disclosure of "'purely factual and uncontroversial' commercial speech." MTD 6 (quoting New York State Rest. Ass'n v. New York City Bd. of Health (NYSRA), 556 F.3d 114, 134

(2d Cir. 2009)). Plaintiff, however, contends that the disclosure requirement attracts at least intermediate scrutiny.[2] Plaintiff acknowledges that the Act "compels commercial speech," but nonetheless argues that it does not qualify for Zauderer review for two reasons. First, plaintiff, citing Sorrell v. IMS Health Inc., 564 U.S. 552 (2011), and the Act's limited exceptions, maintains that the Act should be subject to intermediate scrutiny because "it singles out a class of speakers for differential treatment based on the subject matter of their speech." See Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss the Complaint 14, ECF No. 31 ("MTD Opp."). Second, plaintiff argues that because the Act is not directed at "deceptive advertising" and the disclosure it requires is neither "purely factual" nor "uncontroversial" it does not meet the necessary prerequisites for Zauderer to apply. Id. at 16.

To start, plaintiff's reliance on Sorrell, which dealt with a restriction on speech and not a commercial disclosure requirement, misses the mark. The Second Circuit has reaffirmed on multiple occasions after Sorrell issued that the two-part framework applicable to government regulation of commercial speech subjects disclosure

[2] The Court does not address plaintiff's alternative argument that "[s]trict scrutiny should apply because the Act arbitrarily singles out some commercial speakers . . . based on the subject matter of their advertisements." See Memorandum of Law in Support of Motion for Preliminary Injunction 11 & n.5, ECF No. 9-1 ("PI Mtn."); see also MTD Opp. 7 n.2. Plaintiff concedes that "the Act is likely not subject to strict scrutiny under Second Circuit precedent" and acknowledges that it merely seeks to preserve this argument for later review. See PI Mtn. 11 & n.5; MTD Opp. 7 n.2.

requirements to a standard of review more forgiving than that applicable to restrictions on commercial speech. See, e.g., Volokh, 148 F.4th at 85-87; CompassCare v. Hochul, 125 F.4th 49, 64-65 (2d Cir. 2025); Safelite, 764 F.3d at 262; cf. Vugo, Inc. v. City of New York, 931 F.3d 42, 49-50 (2d Cir. 2019) (concluding that Sorrell did not alter or displace the First Amendment framework applicable to commercial speech restrictions).

Plaintiff points to no case in which Sorrell has ever been applied to evaluate the constitutionality of a commercial disclosure requirement, nor any other support for its contention that Sorrell, which dealt with a restriction on speech that was concededly viewpoint discriminatory, has any application to a run-of-the-mill commercial disclosure mandate such as the one here at issue. See Sorrell, 564 U.S. at 564-65 ("Given the legislature's expressed statement of purpose, it is apparent that [the challenged law] imposes burdens that are . . . aimed at a particular viewpoint."); see also Vugo, 931 F.3d at 50 n.7 (explaining that the restriction in Sorrell sought to "'quiet[]' truthful speech with a particular viewpoint that [the government] 'fear[ed] . . . might persuade'" (quoting Sorrell, 564 U.S. at 576)).

Indeed, the underlying reasons for subjecting commercial disclosure requirements to more forgiving First Amendment scrutiny underscore why Sorrell's concern for "content-and-speaker-based restrictions" does not translate to the commercial disclosure context. Sorrell, 564 U.S. at 564. Unlike restrictions on commercial speech,

which trigger First Amendment scrutiny because of the danger that restricting speech of any kind poses to the "robust and free flow of accurate information," disclosure mandates in fact "promote" the free flow of information that is so fundamental to the First Amendment's reach. NEMA, 272 F.3d at 114 (emphasis added); see also Sorrell, 564 U.S. at 566 (the "consumer's concern for the free flow of commercial speech" justifies the application of heightened scrutiny to a law whose purpose is to "suppress [commercial] speech" (quoting Bates v. State Bar of Ariz., 433 U.S. 350, 364 (1977))).

Accordingly, the regulations at issue in Sorrell prompted heightened scrutiny in part because they had "the effect of preventing [certain speakers] -- and only [those speakers] -- from communicating . . . in an effective and informative manner." Sorrell, 564 U.S. at 564 (emphasis added); see also Vugo, 931 F.3d at 50 n.7. Such an uneven restriction on speech unquestionably poses a threat to the free exchange of ideas. By contrast, the limited exceptions to the disclosure mandate at issue here do not trigger similar concerns, as a disclosure mandate, by its nature, imposes no restriction whatsoever on the free flow of ideas.[3]

---

[3] Whether there exists some set of facts under which a disclosure requirement may in practice so burden a particular viewpoint or subject matter or disadvantage certain speakers so as to trigger the speech-restrictive concerns that motivated the Court in Sorrell is not presented by this case. Plaintiff makes no argument that the limited exceptions from the Act's disclosure requirement have any such effect, simply pointing to the fact that the Act contains exceptions. But that argument is, if anything, best addressed as an argument about the Act's underinclusivity and properly addressed as part of the assessment of its means-end fit. See, e.g., NEMA, 272 F.3d at 115-16 (rejecting

Turning to Zauderer, the Court is not persuaded by any of plaintiff's reasons for concluding that Zauderer does not apply in this case. "[I]nformational disclosure law[s] . . . [are] subject to review under Zauderer," Safelite, 764 F.3d at 262, so long as the required disclosure is of "'purely factual and uncontroversial information' about the goods or services the speaker may offer," Volokh, 148 F.4th at 86 (quoting Zauderer, 471 U.S. at 651); see also NEMA, 272 F.3d at 115 ("Zauderer, not Central Hudson [], describes the relationship between means and ends demanded by the First Amendment in compelled commercial disclosure cases."). Plaintiff has not plausibly alleged that the disclosure mandated by the Act fails to satisfy these requirements.

First, the statement requirement by the Act -- "THIS PRICE WAS SET BY AN ALGORITHM USING YOUR PERSONAL DATA" -- is plainly factual. Plaintiff concedes as much, acknowledging that pricing algorithms "analyze data and publish prices" based on "consumer inputs," and that its members use algorithmic pricing to set prices and offer promotions. Compl. ¶ 11. The Act "by its terms applies only [when a price was set using personalized algorithmic pricing]" and therefore "the disclosure[] [is] necessarily accurate." Milavetz, Gallop & Milavetz, P.A. v. United States, 559 U.S. 229, 251 (2010). In other words, only

the argument that a challenged commercial disclosure law was "unconstitutionally underinclusive" because it "does not get at all facets of the problem it is designed to ameliorate" (quoting Zauderer, 471 U.S. at 652 n.14)).

when a merchant has literally satisfied the disclosure must the merchant "identify" as much. Id. Accordingly, the required disclosure "accurate[ly]" describes plaintiff's members' practices. NEMA, 272 F.3d at 114 & n.4.

To avoid this conclusion, plaintiff points to caselaw from the Ninth Circuit, arguing that the required disclosure is not "purely factual" even if "literally true" because it is "misleading and, in that sense, untrue." Nat'l Ass'n of Wheat Growers v. Bonta, 85 F. 4th 1263, 1276 (9th Cir. 2023) (quoting CTIA v. City of Berkeley, 928 F.3d 832, 847 (9th Cir. 2019)). Even accepting, in the absence of any similar Second Circuit precedent, the proposition that certain "literally true" statements are excluded from Zauderer's reach, plaintiff has not plausibly alleged that the disclosure required here is "misleading." In Wheat Growers, the Ninth Circuit explained that the statement that a certain chemical is "known . . . to cause cancer" was not a "purely factual" statement because "the use of the word 'known' [was] misleading" in context. 85 F.4th at 1268, 1278 (quoting Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics (CERT), 29 F.4th 468, 479 (9th Cir. 2022)). That was so because "an ordinary consumer would not understand the nuance between 'known' as defined in the statute and 'known' as commonly interpreted without the knowledge of the scientific debate on that subject." Id.

Plaintiff does not identify any similarly misleading aspect of the disclosure here. Instead, it merely speculates that the overall statement "gives the misleading, imaginary and 'unsubstantiated'

impression that price-setting algorithms are 'dangerous,'" that they involve "non-consensual invasive surveillance," and that they set prices in ways that are harmful to the consumer. PI Mtn. 19 (quoting Wheat Growers, 85 F.4th at 1277, 1279); MTD Opp. 17. The Court notes that plaintiff's assertions about how consumers will react to the disclosure are entirely speculative.[4] See Bell Atlantic Corp. v. Twombley, 550 U.S. 544, 555 (2007) (allegations "must be enough to raise a right to relief about the speculative level").

In any event, Wheat Growers provides no support for plaintiff's argument, which focuses on the disclosure's "overall message," and not on any specific aspect of the disclosure that plaintiff contends is misleading. See MTD Opp. 17. By contrast, in Wheat Growers, the Ninth Circuit's conclusion was based on the presence of specific language in the challenged warning that it reasoned was susceptible to misinterpretation and that, if so interpreted, would make the statement

[4] In support of its preliminary injunction motion, plaintiff includes affidavits from several of its members expressing their "fear" that customers "may be dissuaded" from purchasing their products if accompanied by the required disclosure because consumers "may think" that they are using personal data to increase prices or that they are using certain categories of sensitive personal data when setting prices. See Moller Decl. ¶ 12, ECF No. 9-4; see also, e.g., Eggert Decl. ¶ 8, ECF No. 9-2 ("I believe th[e] disclosure would give everyone visiting my website or my product page the categorically false idea that I am misusing their information or not respecting their privacy."); Roodman Decl. ¶ 9, ECF No. 9-6; Ravinett Decl. ¶ 8, ECF No. 9-5. Even aside from the fact that the affidavits are irrelevant to defendant's motion to dismiss, these statements, which are not based on plaintiff's member's personal knowledge, do not rise above the level of speculation or conjecture about how consumers will react to the mandated disclosure.

demonstrably false. See Wheat Growers, 85 F.4th at 1278 (reasoning that "a 'known' carcinogen carries a complex legal meaning that consumers would not glean" and which is distinct from the lay meaning of the term (quoting CERT, 29 F.4th at 479)). To the extent that the court in Wheat Growers referenced the "totality of the warning," it did so only to explain why other parts of the statement could not adequately correct the misimpression communicated by the use of the word "known," and not to invite an assessment of a consumer's overall reaction to the message. Id. at 1279.

Plaintiff does point to the terms "personal data" and "algorithm" in this disclosure, speculating that because they are "undefined" they will "falsely imply that the price to which that disclosure is attached is exploitative and based on sensitive personal information, even when it is not." MTD Opp. 17. But, unlike in Wheat Growers, plaintiff stops short of alleging that the meaning of those individual terms, as used in the disclosure, is demonstrably odds with their ordinary meaning and, in that sense, misleading. Plaintiff's argument thus "amounts to little more than a preference" for other terms, not an argument that the terms adopted are inherently misleading. Milavetz, 559 U.S. at 251.

Likewise, plaintiff's attempt to analogize to R.J. Reynolds Tobacco Co. v. FDA, 845 F. Supp. 2d 266 (D.D.C. 2012), is unpersuasive. There, the court considered an FDA rule requiring certain textual warnings and "graphic images" to be printed on cigarette packages. Id. at 269. Assessing only the "graphic-image requirements," the court

concluded that the images were not being used to convey "factual information." The court relied on the government's acknowledgment that the primary purpose of the images was to "elicit negative emotional reactions" and that the images did not depict "common consequence[s]" of smoking but were merely meant to "symbolize[]" its harms. Id. at 273 (emphasis omitted). Thus, the images in that case were not even "literally true." By contrast, plaintiff has not pointed to any part of the disclosure here that communicates anything but "literally true" information about its members' practices.

Second, plaintiff also fails to plausibly allege that the required disclosure is "controversial." The Second Circuit has been clear that a compelled commercial disclosure is not rendered "controversial" merely because the regulated entity does not wish to make that disclosure or because they would prefer to make a different statement on that same topic. See Volokh, 148 F.4th at 87; see also SEC v. City of Rochester, 731 F. Supp. 3d 455, 472073 (W.D.N.Y. 2024) ("Disclosure rules requiring speakers to disclose facts with which the speakers disagree are consistently found not to offend the First Amendment.").

In NYSRA, for example, the Second Circuit applied Zauderer to a law requiring calorie counts to be printed on certain restaurant menus, notwithstanding plaintiff's assertion that "its member restaurants do not want to communicate to their customers that calorie amount should be prioritized among other nutrient amounts." 556 F.3d at 134. The court reasoned that, so long as the government's focus on the required disclosure is "rational," the First Amendment does not bar the

government from mandating "'under-inclusive' factual disclosures." Id. Accordingly, the fact that plaintiff's members would, in the absence of the Act, choose to make a different statement (or none at all) regarding their use of algorithmic pricing does not remove the law from Zauderer's reach. See Volokh, 148 F.4th at 91 ("Social media networks . . . may not want to discuss content moderation policies at all. But that wouldn't remove this regulation from the Zauderer framework.").

Nor, as plaintiff contends, is the disclosure here rendered "controversial" because it requires the speaker to "take sides in a public debate." MTD Opp. 18. Although the Second Circuit has not spoken directly to this consideration, the Supreme Court in NIFLA suggested that certain disclosures that bear on controversial "topic[s]," such as abortion, may not qualify for Zauderer review. See Nat'l Inst. of Fam. & Life Advocs. v. Becerra (NIFLA), 585 U.S. 755, 769 (2018); but see CompassCare, 125 F.4th at 67 (applying Zauderer to a state law requiring employers to disclose information regarding an employee's "reproductive health" rights). Plaintiff, however, makes no more than a conclusory assertion that the topics of "machine learning, algorithms, and artificial intelligence" in general, or algorithmic pricing in particular, are "controversial" in any meaningful way. See PI Mtn. 20; see also MTD Opp. 18. And those topics are hardly more controversial than abortion, which was directly at issue in a disclosure law that the Second Circuit recently upheld under Zauderer. See CompassCare, 125 F.4th at 67.

Furthermore, even if we were to assume, arguendo, that the regulation of these technologies is the subject of "robust public debate" and is therefore "controversial," MTD Opp. 18, that does not mean that "the fact that [plaintiff's pricing mechanisms] are what they are" is itself controversial. Volokh, 148 F.4th at 90 (emphasis omitted); see also, e.g., CompassCare, 125 F.4th at 65 ("[T]he policy judgment that motivated the [state law] may be 'controversial' in the same way that the policy judgments underlying Title VII, or minimum wage laws, are controversial. But the existence and contents of the [law] -- and an employer's obligation to comply with it -- is not itself controversial.").

Plaintiff's members are free to utilize algorithmic pricing or not and are free to communicate their own views about the use of such technologies. Plaintiff's members are not required by the disclosure to "t[ake] sides" in any controversy, no less a "heated political" one. See MTD Opp. 18; PI Mtn. 20 (citation omitted). The disclosure "does not require any statement regarding the merits [of algorithmic pricing]" and plaintiff's members "remain free to share with their [customers]" their own views on that matter, CompassCare, 125 F.4th at 66, including their professed view that algorithmic pricing is "socially beneficial," PI Mtn. 20; Compl. ¶ 15. The law does not require any statement "at war" with that belief. MTD Opp. 5.

Additionally, the required disclosure here relates only to practices that plaintiff's members actually employ in dealing with their own customers. See Compl. ¶¶ 3, 5 (alleging that plaintiff's

members use algorithmic pricing); see also N.Y. Gen. Bus. Law § 349-a(2) (applying the disclosure requirement to "[a]ny entity" that publishes an "announcement of personalized algorithmic pricing to a consumer . . . using personal data specific to such consumer"). Thus, this is not a case in which the law requires plaintiff's members to speak about a potentially controversial practice that "in no way relates to the services that [they] provide." NIFLA, 585 U.S. at 769; see also Volokh, 148 F.4th at 91 (distinguishing a law that requires "an anti-abortion crisis pregnancy center to mention abortion services" from a disclosure that "relate[s] to . . . services" the regulated party "actually provide[s]"). Plaintiff therefore has not identified any basis for concluding that the disclosure required here is anything but "uncontroversial."

Finally, plaintiff argues that the challenged disclosure requirement falls outside of Zauderer's reach because it does not meet the threshold requirement that the statement "seek to correct misleading or deceptive commercial speech." MTD Opp. 16. However, Zauderer is not limited, as plaintiff would have it, to disclosures narrowly designed to "correct" specific instances of "deceptive commercial speech." Id. Zauderer is "broad enough to encompass nonmisleading disclosure requirements," NYSRA, 556 F.3d at 133, and has consistently been applied to evaluate commercial disclosure laws aimed at "the non-disclosure of information material to the consumer," Volokh, 148 F.4th at 87 (quoting Expressions Hair Design v. Schneiderman, 877 F.3d 99, 104 (2d Cir. 2017)).

In NEMA, for example, the Second Circuit applied Zauderer to a Vermont law requiring special labeling of mercury-containing products. 272 F.3d at 115. The court there acknowledged that the law "was not intended to prevent 'consumer confusion or deception' per se, but rather to better inform customers about the products they purchase." Id. (quoting Zauderer, 471 U.S. at 651).

Similarly, the Second Circuit recently found Zauderer review applicable to a law requiring social media networks to publish their content moderation policies, see Volokh, 148 F.4th at 89, as well as to a law requiring employers to provide notification to their employees of their rights under certain state laws, see CompassCare, 125 F.4th at 65-67; see also, e.g., Poughkeepsie Supermarket Corp. v. Dutchess Cnty., 648 F. App'x 157, 158 (2d Cir. 2016) (price sticker requirement intended "to provide complete price information to consumers" satisfied Zauderer). None of these decisions was justified by recourse to specific "misrepresent[ations]" or "misleading" speech that the mandated disclosures aimed to "correct." PI Mtn. 18.

Indeed, the disclosure required here serves to ameliorate "consumer confusion or deception" by ensuring that consumers are better informed about how a merchant has set the displayed price, including the fact that the price may be different for different consumers.[5]

[5] Plaintiff alleges that consumers are benefitted by its members' use of algorithmic pricing in the form of lower overall prices. See Compl. ¶¶ 15, 19. But plaintiff points to no precedent suggesting that just because some consumers might in some circumstances benefit from the use of algorithmic pricing, consumers in general have no interest in being accurately informed about its use. Moreover, plaintiff's

This, then, is not a case where "the disclosure requirement is supported by no interest other than the gratification of 'consumer curiosity.'" NEMA, 272 F.3d at 115 n.6 (quoting Int'l Dairy Foods Ass'n v. Amestoy (IDFA), 92 F.3d 67, 74 (2d Cir. 1996)). Plaintiff, for example, does not allege that the required disclosure is of a practice with "no discernable impact on [the] final product." IDFA, 92 F.3d at 73. To the contrary, it is undisputed that plaintiff's members use algorithmic pricing to set the displayed price, which is undoubtedly part and parcel of the terms on which the product is being offered to the consumer.

Finally, the disclosure required by the Act does not "go[] beyond the speaker's own product or service," Safelite, 764 F.3d at 264, or "prevent[]" a would-be speaker "from conveying additional truthful information" of their choosing, Volokh, 148 F.4th at 87 (quoting Expressions Hair Design, 877 F.3d at 104). In the absence of any of these considerations, Second Circuit precedent points clearly to Zauderer as setting forth the appropriate standard of review.

---

assertion that algorithmic pricing "lower[s] overall consumer prices in the aggregate," id. ¶ 15 (emphasis added), does not mean that consumers uniformly benefit from its use or that the practice is never used to charge certain consumers higher prices. Indeed, plaintiff acknowledges that algorithmic pricing is used to lower prices for some consumers (in the form of "promotions") and not for others, which by definition is a form of price discrimination. Id. ¶ 11; see also Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction 13, ECF No. 30 ("PI Opp.") (plaintiff's "members notably do not disavow their use of personal data to charge customers different prices for the same goods").

The Court therefore next evaluates whether it satisfies this standard.

**C. Application**

A commercial disclosure will pass muster under Zauderer so long as it satisfies Zauderer's "reasonable-relationship rule," NEMA, 272 F.3d at 115, and is not "unjustified or unduly burdensome," Zauderer, 471 U.S. at 651. In the commercial disclosure context, the government need not proffer "evidence or empirical data" to support its claimed justification. Conn. Bar Ass'n v. United States, 620 F.3d 81, 97-98 (2d Cir. 2010).

Plaintiff argues that the Act is both unjustified and unduly burdensome because it is directed at "purely hypothetical" harms, unduly burdens plaintiff's members' speech, and is "fatally underinclusive." MTD Opp. 9-13. Defendant argues that the Act satisfies Zauderer review because it is "reasonably related to the State of New York's legitimate interest in 'help[ing] consumers make informed decisions' regarding the purchase of products and services that are priced using algorithms," and because it is neither unjustified nor unduly burdensome. MTD 11-13.

The challenged disclosure is reasonably related to the government's legitimate interest in ensuring that consumers are "inform[ed]" about the terms on which products are offered to them, including the price. NEMA, 272 F.3d at 115; see also NYSRA, 556 F.3d at 133 (Zauderer is "broad enough to encompass nonmisleading disclosure requirements"); Volokh, 148 F.4th at 87 (Zauderer applies to laws

aimed at "the non-disclosure of information material to the consumer" (quoting Expressions Hair Design, 877 F.3d at 104)).

Although the Act does not have an extensive legislative history, its stated aims are consistent with this goal. The Act was introduced as part of the proposed Executive Budget, which explained that its purpose was to "enhance consumer protections" by "enhanc[ing] consumers' awareness of sellers that offer or sell goods or services at a price based on personalized consumer data." FY 2026 N.Y. State Exec. Budget, Transp., Econ. Dev. & Env't Conservation Art. VII Legis., Memorandum in Support at 20, https://www.budget.ny.gov/pubs/archive/fy26/ex/artvii/ted-memo.pdf (last visited Oct. 6, 2025).

A substantially similar version of the Act was also introduced as a stand alone bill in the New York State Senate. See S7033, 2025-2026 Legis. Sess. (N.Y. 2025). Citing to a 2025 Federal Trade Commission (FTC) report,[6] the Sponsor's Memo noted that companies can use

---

[6] See Fed. Trade Comm'n, FTC Surveillance Pricing 6(b) Study: Research Summaries; A Staff Perspective (Jan. 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/p246202_surveillancepricing6bstudy_researchsummaries_redacted.pdf ("FTC Surveillance Pricing"). Plaintiff complains that the FTC publication, which was "not an exhaustive declaration of [the FTC's] findings" and comprised only "initial observations," demonstrates that the State's stated concerns are "hypothetical." MTD Opp. 10; FTC Surveillance Pricing at 1. The fact that the publication contained only "initial findings" does not, however, mean that those findings were speculative or hypothetical. See FTC Surveillance Pricing at 1. The FTC cautioned that the "summaries d[id] not represent the full breadth of information, degree of nuance, or level of detail with which staff are currently working," but nonetheless sought to share what "staff [had] learn[ed] so far" about the types of algorithmic pricing tools being offered, how those tools work "to target prices or segment users," the

algorithmic pricing to "charge[] [consumers] different prices for the same product or service." Thus, the bill "aim[ed] to protect New York consumers by requiring disclosures when prices are based on personal data" in order to "increase transparency, promote fairness, and help consumers make informed decisions." Id.

Pointing to NIFLA, plaintiff argues that the disclosure requirement is aimed at a "purely hypothetical" problem and is therefore unjustified. See MTD Opp. 9 (citing NIFLA, 585 U.S. at 776-77). But, by plaintiff's own admission, its members use personalized algorithmic pricing, including for the purpose of offering different prices to different consumers. See Compl. ¶¶ 3, 5, 11. Moreover, in NIFLA, the Court concluded that the disclosure requirement was aimed at "purely hypothetical" harms because the government had denied that the mandated disclosure was aimed at communicating information that a consumer might not already have. See 585 U.S. at 776 ("At oral argument . . . California denied that the justification for the [challenged act] was that women 'go into [crisis pregnancy centers] and they don't realize what they are.'"). By contrast, the government's stated interest here is to ensure that consumers are informed about the use of personalized algorithmic

"data sources and types of data collected," and their "effects on prices, sales, revenue, or consumers." Id. at 2-3. Accordingly, the FTC's research summary indicated that, based on the tools reviewed by staff, algorithmic pricing tools can be used to generate individualized pricing and promotions based on individual consumer data. See id. at 3, 5-6. The non-exhaustive nature of the publication does not make the existence of such technology "hypothetical."

pricing. And every indication is that consumers would not know that a price was set using their personal information without a disclosure. See Hayes v. N.Y. Att'y Grievance Comm., 672 F.3d 158, 167-68 (2d Cir. 2012) (finding "no First Amendment infirmity" in a compelled disclosure based on the "self-evident" "risk that some members of the public" would, in the absence of the disclosure, reach a contrary conclusion). Accordingly, plaintiff's reliance on NIFLA for the proposition that the disclosure is directed at a "purely hypothetical" problem is unavailing.

Moreover, the state's interest in ensuring that consumers are informed about the terms on which products and services are offered to them is a cognizable interest under Zauderer. For example, the Second Circuit recently concluded that a disclosure requirement aimed at "ensur[ing] that [social media] users are fully informed about the terms of their engagement with a social media network," thereby "enabling them to make more informed choices about where they spend their screen time," would satisfy Zauderer review. Volokh, 148 F.4th at 91. A disclosure requirement that seeks to enable consumers to make "informed choices" by providing them with information material to their consumption decisions thus falls comfortably within Zauderer's reach. Id.; see also Expressions Hair Design, 877 F.3d at 104 (Zauderer applies to laws aimed at "the non-disclosure of information material to the consumer").

Additionally, as noted above, the disclosure here reasonably bears on the "final product" and therefore rises above above mere

gratification of "consumer curiosity." IDFA, 92 F.3d at 73-74 (concluding that "consumer interest" alone could not justify a compelled disclosure directed at a "production method" with "no discernable impact on [the] final product"); see also NEMA, 272 F.3d at 115 & n.6 (distinguishing IDFA and reasoning that a disclosure directed at "better inform[ing] consumers about the products they purchase," rather than "'consumer confusion or deception' per se," satisfied Zauderer review).

The Act's disclosure requirement also is not "unduly burdensome." Zauderer, 471 U.S. at 651. The disclosure requirement "does not impair [plaintiff's members'] ability to convey their own beliefs" about algorithmic pricing, including its purported benefits. CompassCare, 125 F.4th at 67; see also Milavetz, 559 U.S. at 250 (disclosure requirement "does not prevent [regulated parties] from conveying any additional information"). It does not "interfere with [plaintiff's members'] greater message [or] mission" or prevent them from sharing their view that consumers will be benefitted by algorithmic pricing "in the aggregate." Id. at 66; MTD Opp. 12 (citing Compl. ¶¶ 15, 33). Plaintiff's members remain free to communicate that message and any additional message of their choosing.

Plaintiff contends that, in practice, the disclosure requirement nonetheless "tends to displace [its members'] own speech" because there is limited "pixel space" on any given online product page and the Act requires plaintiff's members to "sacrifice" a meaningful portion of that limited space to the mandatory disclosure. MTD Opp.

13; see also PI Mtn. 10. Disclosure requirements, however, often pertain to displays with limited space. See, e.g., NEMA, 272 F.3d at 107 (product labeling). And the requirement that some of that space be dedicated to a mandatory disclosure does not render the disclosure "intrinsically burdensome," even if the speaker would prefer to use that space for another purpose. Zauderer, 471 U.S. at 653 n.15; see also, e.g., R J Reynolds Tobacco Co. v. FDA, 96 F.4th 863 (5th Cir. 2024) (rejecting claim that mandated tobacco-use warnings are "unduly burdensome" because "plaintiffs can still speak on 80% of their advertisements, and they still control more than 50% of the total surface area of their cigarette packages").

The cases that plaintiff points to at most indicate that a disclosure requirement is "unduly burdensome" if it has the effect of "drown[ing] out" the regulated party's own speech. NIFLA, 585 U.S. at 778. In NIFLA, for example, the Court reasoned that the nature of the disclosure and the level of "'detail required . . . effectively rule[d] out' the possibility" that the regulated party would speak at all. Id. (quoting Ibanez v. Fl. Dep't of Bus. & Pro. Regul., 512 U.S. 136, 146 (1994)).

Plaintiff has not plausibly alleged that this is the case here. The mandatory one-sentence disclosure may be in any font or format, so long as it "easily visible" and "provided on, at, or near . . . [the] price." N.Y. Gen. Bus. Law § 349-a(1)(b), (2). Plaintiff's conclusory allegation that its members "will have to surrender a significant amount" of "[t]he pixel space on any given product page"

is not plausible in light of the modest nature of the disclosure the Act imposes. See Compl. ¶ 27. And, in any event, the fact that a disclosure mandate might theoretically require plaintiff's members to "surrender" a "significant amount" of "pixel space" does not plausibly indicate that complying with the mandate will "'rule out' the possibility" that plaintiff's members will speak at all. NIFLA, 585 U.S. at 778 (quoting Ibanez, 512 U.S. at 146). This is especially so given that plaintiff's allegations all pertain to online "pixel space," which by its nature is not so space-limited as the traditional print advertising on which disclosure requirements have consistently been upheld.

Finally, the Act is not rendered "unduly burdensome" by the presence of limited exceptions. Plaintiff does not explain why exempting certain speakers from the Act's coverage increases the burden to its members of complying with the disclosure requirement. But, in any event, it is well-established that a commercial disclosure requirement need "not get at all facets of the problem it is designed to ameliorate." Zauderer, 471 U.S. at 651 n.14. A disclosure requirement is not rendered constitutionally deficient merely because it is "under-inclusive." Id. To the extent that plaintiff's argument is that the Act is "so grossly underinclusive that it will not advance the State's interests" at all, that allegation is implausible. MTD Opp. 13. Only insurance companies and certain financial institutions are exempted, both of which are already subject to independent regulatory regimes. See N.Y. Gen. Bus. Law § 349-a(3). There is thus

every indication that the the disclosure requirement reaches the vast majority of merchants with whom consumers interact.

## IV. Conclusion

For the foregoing reasons, plaintiff has not plausibly alleged that the challenged disclosure requirement violates the First Amendment. Thus, plaintiff also cannot demonstrate an entitlement to preliminary injunction relief.

Accordingly, defendant's motion to dismiss, ECF No. 20, is GRANTED and plaintiff's claims are DISMISSED with prejudice. The motion for a preliminary injunction, ECF No. 9, is DISMISSED as moot.

The Clerk of Court is respectfully directed to enter judgment and close the case.

SO ORDERED.

New York, NY
October 8, 2025

JED S. RAKOFF, U.S.D.J.

McKinney's Consolidated Laws of New York Annotated
General Business Law (Refs & Annos)
Chapter 20. Of the Consolidated Laws
Article 22-a. Consumer Protection from Deceptive Acts and Practices (Refs & Annos)

McKinney's General Business Law § 349-a

§ 349-a. Pricing

Effective: July 8, 2025
Currentness

1. As used in this section, the following terms shall have the following meanings:

(a) "Algorithm" means a computational automated process that uses a set of rules to define a sequence of operations.

(b) "Clear and conspicuous disclosure" means disclosure in the same medium as, and provided on, at, or near and contemporaneous with every advertisement, display, image, offer or announcement of a price for which notice is required, using lettering and wording that is easily visible and understandable to the average consumer.

(c) "Consumer" means a natural person who is seeking or solicited to purchase, lease or receive a good or service for personal, family or household use.

(d) "Personal data" means any data that identifies or could reasonably be linked, directly or indirectly, with a specific consumer or device. "Personal data" shall not include location data that is used by a for-hire vehicle as defined in section 19-502 of the administrative code of the city of New York or as otherwise defined in local law or rule, or a transportation network company vehicle as defined in section sixteen hundred ninety-one of the vehicle and traffic law, solely to calculate the fare based on mileage and trip duration between the passenger's pickup and drop-off locations.

(e) "Dynamic pricing" means pricing that fluctuates dependent on conditions.

(f) "Personalized algorithmic pricing" means dynamic pricing set by an algorithm that uses personal data as defined in this section.

(g) "Entity" means any natural person, firm, organization, partnership, association, corporation, or any other entity domiciled or doing business in New York state.

2. Any entity that sets the price of a specific good or service using personalized algorithmic pricing, and that directly or indirectly, advertises, promotes, labels or publishes a statement, display, image, offer or announcement of personalized algorithmic pricing to a consumer in New York, using personal data specific to such consumer, shall include with such statement, display, image, offer or announcement, a clear and conspicuous disclosure that states:


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

"THIS PRICE WAS SET BY AN ALGORITHM USING YOUR PERSONAL DATA".

3. Exceptions. Nothing in this section shall apply to:

(a) A person, firm, partnership, association, or corporation, or agent or employee thereof, who or that is subject to the insurance law or regulations promulgated thereunder.

(b) Any financial institution or affiliate of a financial institution, all as defined in 15 U.S.C. 6809, to the extent that the financial institution or affiliate is subject to Title V of the Gramm Leach Bliley Act (15 U.S.C. § 6801, et seq., as amended) and the rules and implementing regulations promulgated thereunder.

(c) A financial institution as defined in subsection (f) of section eight hundred one of the financial services law.

(d) A price that is offered to a consumer who has an existing subscription-based contract or subscription-based agreement for goods or services with an entity and where such price is less than the price for the same good or service set forth in the subscription-based agreement or subscription-based contract.

4. Where the attorney general shall have reason to believe that there is an alleged violation of this section based upon, among other things, a consumer report of an alleged violation, the attorney general, in the name of the people of the state of New York, shall dispatch a cease and desist letter to the entity at issue, specifying the alleged violation or violations and the remedies to cure the violations within a designated timeline. Where, after receipt of the cease and desist letter and the expiration of such designated timeline, the entity continues to violate this section, an application may be made by the attorney general in the name of the people of the state of New York to a court or justice having jurisdiction by a special proceeding to issue an injunction, and upon notice to the respondent of not less than five days, to enjoin and restrain the continuance of such violations; and if it shall appear to the satisfaction of the court or justice that the respondent has, in fact, violated this section, an injunction may be issued by such court or justice, enjoining and restraining any further violation, without requiring proof that any person has, in fact, been injured or damaged thereby. Whenever the court shall determine that a violation of this section has occurred, the court may impose a civil penalty of not more than one thousand dollars for each violation.

This section shall not be construed to limit any other criminal or civil liability such entity may be subject to under law.

**Credits**
(Added L.2025, c. 58, pt. X, § 1, eff. July 8, 2025.)

McKinney's General Business Law § 349-a, NY GEN BUS § 349-a
Current through L.2025 chapters 1 to 713. Some statute sections may be more current, see credits for details.

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

CONSTITUTION ANNOTATED
Analysis and Interpretation of the U.S. Constitution

## Constitution of the United States

# First Amendment

First Amendment Explained

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.