# 25-2818

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

––––––––––––––

NATIONAL RETAIL FEDERATION,
*Plaintiff-Appellant,*

v.

LETITIA JAMES, in her official capacity as Attorney General of New York,
*Defendant-Appellee.*

––––––––––––––

On Appeal from the United States District
Court for the Southern District of New York
(Case No. 21-cv-5500) (Judge Jed S. Rakoff)

––––––––––––––

**BRIEF OF WASHINGTON LEGAL FOUNDATION
AS AMICUS CURIAE SUPPORTING
PLAINTIFF-APPELLANT AND REVERSAL**

––––––––––––––

Cory L. Andrews
Zac Morgan
 *Counsel of Record*
WASHINGTON LEGAL FOUNDATION
2009 Massachusetts Ave. NW
Washington, DC 20036
(202) 588-0302
zmorgan@wlf.org

*Counsel for Amicus Curiae
Washington Legal Foundation*

January 13, 2026

## DISCLOSURE STATEMENT

Washington Legal Foundation has no parent company, issues no stock, and no publicly held company owns a ten percent or greater interest in it.

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ...........................................................................i

TABLE OF AUTHORITIES ..........................................................................iii

INTEREST OF AMICUS CURIAE ............................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................ 1

ARGUMENT ................................................................................................. 6

I.     THIS ISN'T A *ZAUDERER* CASE ..................................................... 6

II.    SCARY LABELING CAN'T SURVIVE EXACTING SCRUTINY .................... 13

     A. The State hasn't shown that a sufficiently substantial
        governmental interest is at stake ............................................. 13

     B. Even if there were a sufficiently important interest,
        compelling speech is far from a narrowly tailored remedy ...... 16

III.   CLOSE COMPELLED-SPEECH QUESTIONS SHOULD BE RESOLVED
     FOR THE SPEAKER, NOT THE COMPELLER .......................................... 18

CONCLUSION ........................................................................................... 19

CERTIFICATE OF COMPLIANCE ........................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ams. for Prosperity Found. v. Bonta,*
594 U.S. 595 (2021) .................................................................. 4, 13, 16

*Austin v. Mich. Chamber of Com.,*
494 U.S. 652 (1990) ...................................................................... 16

*Brown v. Entertainment Merchants Ass'n,*
564 U.S. 786 (2011) ...................................................................... 11

*Cent. Hudson Gas & Elec. Corp. v.*
*Pub. Serv. Comm'n of N.Y.,*
447 U.S. 557 (1980) ............................................................. 3, 5, 13, 17

*CompassCare v. Hochul,*
125 F.4th 49 (2d Cir. 2025) ............................................................... 7

*Edenfield v. Fane,*
507 U.S. 761 (1993) ................................................................ 3, 9, 14

*Expressions Hair Design v. Schneiderman,*
581 U.S. 37 (2017) ...................................................................... 2, 6

*Fed. Election Comm'n v. Wis. Right to Life, Inc.,*
551 U.S. 449 (2007) ..................................................................... 5, 18

*Ibanez v. Fla. Dep't of Bus. & Prof. Regul.,*
512 U.S. 136 (1994) ....................................................................... 4

*In re Primus,*
436 U.S. 412 (1978) ..................................................................... 5, 13

*Int'l Dairy Foods Ass'n v. Amestoy,*
92 F.3d 67 (2d Cir. 1996) .............................................................. 2, 10

*McCutcheon v. Fed. Election Comm'n,*
572 U.S. 185 (2014)...................................................................16

*Moody v. NetChoice,*
603 U.S. 707 (2024)................................................................. 1, 2

*Nat'l Elec. Mfrs. Ass'n v. Sorrell,*
272 F.3d 104 (2d Cir. 2001) ...................................... 4, 7, 12

*Nixon v. Shrink Mo. Gov't PAC,*
528 U.S. 377 (2000)....................................................................9

*N.Y. State Rest. Ass'n v. N.Y. City Bd. of Health,*
556 F.3d 114 (2d Cir. 2009) ......................................... 7, 12

*Pittsburgh Press Co. v.*
*Pittsburgh Comm'n on Hum. Relations,*
413 U.S. 376 (1973)..................................................................10

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,*
487 U.S. 781 (1988)............................................................ 2, 10

*R.J. Reynolds Tobacco Co. v. FDA,*
96 F.4th 863 (5th Cir. 2024) ............................................. 7

*Ragin v. N.Y. Times Co.,*
923 F.2d 995 (2d Cir. 1991) ............................................14

*Rubin v. Coors Brewing Co.,*
514 U.S. 476 (1995)............................................................ 9, 17

*Sorrell v. IMS Health Inc.,*
564 U.S. 552 (2011)....................................... 9, 10, 16, 17

*Thomas v. Collins,*
323 U.S. 516 (1945)..................................................................13

iv

*TikTok v. Garland,*
    604 U.S. 56 (2025) ..................................................................... 14

*United States v. Harriss,*
    347 U.S. 612 (1954) .................................................................... 14

*Va. State Bd. of Pharm. v.*
    *Va. Citizens Consumer Council, Inc.,*
    425 U.S. 748 (1976) .................................................................... 10

*Volokh v. James,*
    148 F.4th 71 (2d Cir. 2025) .................................................. 11, 14

*Wisc. Right to Life, Inc. v. Barland,*
    751 F.3d 804 (7th Cir. 2014) ...................................................... 13

*Wooley v. Maynard,*
    430 U.S. 705 (1977) ................................................................. 6, 17

*Zauderer v. Office of Disciplinary Counsel,*
    471 U.S. 626 (1985) .......................................................... 3, 4, 7, 11

## Constitutional Provisions

U.S. Const., amend. I .................................................................. *passim*

## Statutes

N.Y. Gen. Bus. § 349-a(1)(a) ......................................................... 8

N.Y. Gen. Bus. § 349-a(2) ................................................... 4, 7, 8, 12

## Other Authorities

Jonathan F. Cohn & Paul J. Ray,
    *First Amendment Limits Government's Power to Compel*
    *Commercial Speech,*
    WLF Legal Opinion Ltr. (Mar. 10, 2017) ........................................ 1

Adam Smith,
   *An Inquiry into the Nature and Causes of the Wealth of Nations,*
   (R. H. Campbell & A. S. Skinner eds.,
   Oxford Univ. Press 1976) (1776) ....................................................... 15

## INTEREST OF AMICUS CURIAE*

Washington Legal Foundation is a nonprofit, public-interest law firm and policy center with supporters nationwide. WLF promotes free enterprise, individual rights, limited government, and the rule of law. It often appears as amicus curiae in First Amendment cases to oppose government compulsion of speech and association. *E.g.*, *Moody v. NetChoice*, 603 U.S. 707 (2024). In addition, WLF's Legal Studies Division, the foundation's publishing arm, regularly produces papers on the inherent constitutional dangers of state-compelled speech. *E.g.*, Jonathan F. Cohn & Paul J. Ray, *First Amendment Limits Government's Power to Compel Commercial Speech*, WLF Legal Opinion Ltr. (Mar. 10, 2017).

## INTRODUCTION AND SUMMARY OF ARGUMENT

The First Amendment forbids self-justifying restrictions on commercial speech. Just because something is technically true and might be interesting, the government can't force a seller to say it and then turn

---

* No party's counsel authored any part of this brief. No one, apart from WLF and its counsel, contributed money intended to fund the brief's preparation or submission. All parties consented to WLF's filing this brief.

1

around and justify that compulsion because the script is technically true and maybe interesting. *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 798 (1988) ("Although the foregoing factual information might be relevant to the listener . . . a law compelling its disclosure would clearly and substantially burden the protected speech"). This rule holds even if the technically-true-and-maybe-interesting thing is about a commercial transaction. *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 74 (2d Cir. 1996) ("[C]onsumer curiosity alone is not a strong enough state interest to sustain the compulsion of even an accurate, factual statement"). Or even if it's about how a retailer designed an offer. *See Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 48 (2017) ("In regulating the communication of prices" a state "regulates speech").

And, yes, even if a computer program—carrying out a mission set by the retailer—calculates the price and makes the offer. The First Amendment rights of a company are not diminished when it uses "an algorithm to help . . . even if the algorithm does most of the [work] without a person in the loop." *Moody*, 603 U.S. at 745–46 (Barrett, J., concurring).

2

The district court's contrary decision misapplied and misunderstood the standard of review. The appropriate standard is exacting scrutiny. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980). The district court sought to apply the more deferential standard of *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985)—that's error enough to merit reversal. But worse yet, the district court didn't really apply *Zauderer* at all.

Instead, it took the National Retail Federation through the looking glass by shifting the burden of proof from the government to the speaker. *Compare* SPA-13 ("The Court notes that plaintiff's assertions about how consumers will react to the disclosure are entirely speculative") *with Edenfield v. Fane*, 507 U.S. 761, 770–71 (1993) ("This burden is not satisfied by mere speculation or conjecture; rather, a *governmental body* seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real") (emphasis supplied) (*see* citing *Zauderer*, 471 U.S. at 648–49 and collecting cases). Under *Zauderer*, the burden is still the State's to show that speech about a commercial transaction is misleadingly incomplete (and only direct government action can finish the thought)—not on the speaker to prove that the

3

State's preferred addition has a flaw. SPA-12 ("Plaintiff does not identify any similarly misleading aspect of the disclosure here").

In any event, neither *Zauderer* nor the district court's topsy-turvy version is the right framework. *Zauderer* is a narrow exception to exacting scrutiny that applies only when the government's compelled disclosure is "purely factual *and* uncontroversial." 471 U.S. at 651 (emphasis supplied). It's "*Zauderer*-uncontroversial" when a state law warns of a health hazard, *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 116 (2d Cir. 2001), or staves off a serious risk of deception. *Ibanez v. Fla. Dep't of Bus. & Prof. Regul.*, 512 U.S. 136, 146 (1994). But New York isn't doing that. Instead, the State's law hijacks commercial speech that poses no obvious risk of bodily harm or the ancient crime of fraud. N.Y. Gen. Bus. § 349-a(2). When it interrupts that speech to blast out something of possible interest on the business's dime, a state's compulsory disclosure falls out of *Zauderer*'s grasp.

So exacting scrutiny applies, *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 608 (2021) (Roberts, C.J., controlling), and New York's scary warning label can't survive it. N.Y. Gen. Bus. § 349-a(2). That standard requires the government to point to a sufficiently vital state

4

interest *and* prove that its ventriloquism is "'narrowly drawn'" to it— "[t]he regulatory technique may extend only as far as the interest it serves." *Cent. Hudson*, 447 U.S. at 565 (quoting *In re Primus*, 436 U.S. 412, 438 (1978)). Where "narrower restrictions on expression would serve [the government's asserted] interest," the speech mandate must fall. *Id.*

All this means that New York's law must be cashiered. The State has failed to demonstrate that computer-generated pricing is harmful at all, let alone that its regulation serves a sufficiently vital government interest. The State may not like that computer programs can make a willing seller more properly match the price point of a willing buyer, but there's no public harm when markets clear. And even if you spot the State a hypothetically sufficient interest in suppressing computer-generated pricing, it still can't meet its burden of showing that compelling speech is a less restrictive means of "directly advanc[ing]" that algorithm-phobic mission. *Cent. Hudson*, 447 U.S. at 566.

Finally, so long as the Court considers all this a close question, it should apply the Supreme Court's instruction that "[w]here the First Amendment is implicated, the tie goes to the speaker, not the censor" or the compeller. *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S.

449, 474 (2007) (Roberts, C.J., controlling). "The Bill of Rights was designed to fence in the government and make its intrusions on liberty difficult and its interference with freedom of expression well-nigh impossible." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 72–73 (1963) (Douglas, J., concurring) (capitalization altered). In sum, governments infringing on "the right to refrain from speaking" do not get the benefit of the doubt. *Wooley v. Maynard*, 430 U.S. 705, 714 (1977).

## ARGUMENT

### I. THIS ISN'T A *ZAUDERER* CASE.

How a seller poses an offer to a prospective buyer—whether the price is set by a human or a computer program—is protected by the First Amendment. *Expressions Hair Design*, 581 U.S. at 48 ("[R]egulating the communication of prices rather than prices themselves . . . regulates speech"). The National Retail Federation's members have found a way to quickly and efficiently bargain directly with consumers to "offer promotions, adjust pricing, and reward consumer loyalty"—in short, matching a willing seller with a willing buyer's price point—with none of the awkwardness or resource-intensiveness of haggling. SPA-3–4. (internal quotation marks and citation omitted).

New York doesn't like this. And even though it obviously would have no legitimate government interest in forcing a merchant to declare that a "PRICE WAS SET BY A HUMAN BEING AFTER CONSIDERING MARKET DEMAND," it insists that when a computer program sets the price, it can force that transaction to bear the scary warning that "THIS PRICE WAS SET BY AN ALGORITHM USING YOUR PERSONAL DATA." N.Y. Gen. Bus. § 349-a(2). But there's no "algorithm exception" to the First Amendment.

Perhaps aware of this deficiency, New York requests that its script be treated with great deference, as if a personalized price set by a computer program is akin to the health hazards posed by cigarettes, *R.J. Reynolds Tobacco Co. v. FDA*, 96 F.4th 863, 887 (5th Cir. 2024), mercury poisoning, *Nat'l Elec. Mfrs. Ass'n*, 272 F.3d at 116, and obesity, *N.Y. State Rest. Ass'n v. N.Y. City Bd. of Health*, 556 F.3d 114, 136 (2d Cir. 2009); as important as official reminders to employees of the civil rights laws, *CompassCare v. Hochul*, 125 F.4th 49, 67 (2d Cir. 2025); or as dire as correcting a misleading, fraud-risking pitch for the services of a learned professional. *Zauderer*, 471 U.S. at 651. But the State hasn't done the work of showing that an item's unadorned pricing by a "computational

7

automated process," N.Y. Gen. Bus. § 349-a(1)(a), poses a societal risk equal to cancer, organ damage, heart disease, racism, workplace misconduct, or fraud.

The district court excused this failure because the words the State foists on retailers are "'literally true'" and may be of interest to a consumer. SPA-15; *id.* at 19 ("[C]onsumers are better informed about how a merchant has set the displayed price, including the fact that the price may be different for different consumers"). The district court found that this justified not only applying *Zauderer*'s laxer form of judicial review— bad enough—but loosening *Zauderer* even further by putting the onus on the National Retail Federation to justify why its members shouldn't have to put up with New York's puppetry.

Although the State's disclaimer is self-evidently designed to caution a would-be buyer against buying from a merchant using an "ALGORITHM" that uses her "PERSONAL DATA," N.Y. Gen. Bus. § 349-a(2), the district court rejected as "speculation," SPA-13, n.4, the Federation's commonsense objection that suggesting a merchant's AI engaged in cyber-burglary will chill commerce. Again, even under *Zauderer*, it's the *State*, not the business, that is forbidden to rest its case

8

on "mere speculation or conjecture." *Edenfield*, 507 U.S. at 770; *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 392 (2000) ("We have never accepted mere conjecture as adequate to carry a First Amendment burden").

So rather than forcing the State to establish that the covered commercial transactions really contain "incomplete or inaccurate information," *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 493 (1995) (Stevens, J., concurring), the district court flipped the burden and demanded that the *speaker* establish that the *government*'s script doesn't mislead. SPA-13; *cf. Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571–72 (2011) ("Under a commercial speech inquiry, it is the *State*'s burden to justify its content-based law as consistent with the First Amendment") (emphasis supplied).

If the district court's blurred *Zauderer* standard becomes the law of this Circuit, there's no end to what a state might compel a commercial speaker to say. A company's net worth may be of interest to consumers who prefer to patronize smaller enterprises ("THIS COMPANY IS VALUED IN THE BILLIONS"). The gender or race of a firm's chief executive or principal shareholder might be of interest to those who prefer to buy from women-owned or minority-owned concerns ("THIS

9

COMPANY IS OWNED BY A MAN"). Some consumers wish to communicate their foreign policy views through what items they buy. ("THIS PRODUCT MADE IN OCCUPIED PALESTINIAN TERRITORY"). Those statements, when the company fits the bill, would be literally true, wouldn't be misleading, and could affect a customer's choices. But do we really want to go down that road? *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Relations*, 413 U.S. 376, 399 (1973) (Burger, C.J., dissenting) ("As Mr. Justice Stewart says, we have witnessed a growing tendency to cut down the literal requirements of First Amendment freedoms so that those in power can squelch someone out of step").

The answer is no—and that "choice . . . is one that 'the First Amendment makes for us.'" *IMS Health*, 564 U.S. at 578 (quoting *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 770 (1976)). The State's informational interest doesn't apply to any information that a consumer might find interesting, even where providing that knowledge might affect a financial transaction. *Riley*, 487 U.S. at 798; *Int'l Dairy Foods Ass'n*, 92 F.3d at 75 (Leval, J., dissenting) (noting that "a majority of Vermonters" probably wanted the disclosure

10

this Court deemed unconstitutional). Because "'government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Volokh v. James*, 148 F.4th 71, 84 (2d Cir. 2025) (quoting *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 790–91 (2011)), this Court "treat[s] a law compelling—rather than restricting—speech" as presumptively unconstitutional. *Id.*

Properly understood, *Zauderer* is a narrow carve-out from that presumption. We should recall that Philip Zauderer's advertisement was (to pick up a phrase) "literally true." Among other things, his ad promised that "'if there is no recovery, no legal fees are owed by our clients.'" *Zauderer*, 471 U.S. at 652. Although factually accurate, the "possibility of deception" was "self-evident." *Id.* So there was nothing controversial about the government forcing him to complete the sentence and resolve the dangerous ambiguity—a client won't owe "fees," but may carry "costs." *Id.* at 652–53. The government redlined Mr. Zauderer's work out of a legitimate and painfully obvious concern that without disclosure, a potential client might be swindled into thinking something was free when it was not.

11

Or consider mandatory mercury labeling or a compelled calorie-count on a menu—both instances where this Court determined *Zauderer* scrutiny sufficed. Mercury poisoning is toxic—and flagging a bulb's mercury content reinforces that consumers have a choice between mercury and LED lightbulbs. *See Nat'l Elec. Mfrs. Ass'n*, 272 F.3d at 115, n.6. Obesity kills—and the caloric content of foods can be counterintuitive. *N.Y. State Rest. Ass'n*, 556 F.3d at 136 (" . . . a smoked turkey sandwich at Chili's contains 930 calories, more than a sirloin steak, which contains 540, or that 2 jelly-filled doughnuts at Dunkin' Donuts have fewer calories than a sesame bagel with cream cheese").

The State's disclaimer in this case warns of no hidden health hazard and spotlights no risk that a computer-set bespoke price isn't a bona fide offer. But no rational viewer will think that the disclaimer—"THIS PRICE WAS SET BY AN ALGORITHM USING YOUR PERSONAL DATA"—was affixed because the underlying offer is *trustworthy*. N.Y. Gen. Bus. § 349-a(2). This ominous warning suggests a privacy breach conducted by a frightful machine, unconstrained by human hands. But a personalized solicitation derived from a shopper's browsing and location history—her opt-in by visiting a website, no less—

12

isn't Skynet, it's the type of direct offer explicitly under the protection of the First Amendment. *Thomas v. Collins*, 323 U.S. 516, 531–32 (1945).

## II.   SCARY LABELING CAN'T SURVIVE EXACTING SCRUTINY.

"Regardless of the type of association, compelled disclosure requirements are reviewed under exacting scrutiny." *Americans for Prosperity*, 594 U.S. at 608 (Roberts, C.J., controlling). "This is not a loose form of judicial review," *Wis. Right to Life, Inc. v. Barland*, 751 F.3d 804, 840 (7th Cir. 2014), and the imposition of a scary disclaimer can't survive such a "strict test." *Buckley v. Valeo*, 424 U.S. 1, 66 (1976) (*per curiam*) (describing exacting scrutiny). *Central Hudson* forces the government to point to a concrete and "substantial" state interest *and* demonstrate that its takeover of a commercial communication is "'narrowly drawn'" to it— "[t]he regulatory technique may extend only as far as the interest it serves." *Cent. Hudson*, 447 U.S. at 564–65 (quoting *In re Primus*, 436 U.S. at 438).

### A. *The State hasn't shown that a sufficiently substantial governmental interest is at stake.*

The district court identified the government's interest as "ensuring that consumers are informed about the terms on which products are offered to them, including the price," SPA-21 (internal quotation marks,

13

citation, and brackets omitted), such as "the fact that the price may be different for different consumers." *Id.* at 19. Applying the inapposite *Zauderer* standard, this Court found that mandating disclosure of differential pricing was a "legitimate" state interest. *Id.* at 21. But while all "substantial" interests are necessarily "legitimate," not all "legitimate" interests rise to the level of "substantiality."

An interest in flagging the existence of differential pricing is woefully insufficient to carry a First Amendment burden. Consider those interests that *have* been found important enough under heightened First Amendment scrutiny: National security. *TikTok v. Garland*, 604 U.S. 56 (2025). Violence prevention. *Volokh*, 148 F.4th at 94. Knowing "who is being hired, who is putting up the money, and how much" to directly lobby members of Congress. *United States v. Harriss*, 347 U.S. 612, 625 (1954). Upholding the fair housing laws. *Ragin v. N.Y. Times Co.*, 923 F.2d 995, 1002–03 (2d Cir. 1991). Combatting false advertising. *Edenfield*, 507 U.S. at 768. All of those interests involve tangible—not hypothetical—harms, because a "governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are *real*." *Id.* at 770–71 (emphasis supplied).

14

New York hasn't carried out this responsibility. Even the district court's speculation—that perhaps future computer-set offers might be *higher* than the general price, because an algorithm might discern that some consumers can be induced to pay a higher rate for something they really want—would only suggest that computers are making markets more efficient. There's no *public* harm when a safe, legal product is sold from a willing seller to a willing buyer for an agreed price—even if a differently situated buyer may have been able to make the same purchase at a lower price. That's how markets work. As Adam Smith put it, prices are set "not by any accurate measure, but by the higgling and bargaining of the market, according to that sort of rough equality which, though not exact, is sufficient for carrying on the business of common life." Adam Smith, *An Inquiry into the Nature and Causes of the Wealth of Nations* 49 (R. H. Campbell & A. S. Skinner eds., Oxford Univ. Press 1976) (1776).

Sure, the district court may have believed it would be socially desirable for computer-set differential pricing to be chilled—or to disappear altogether—but the "premise of our Bill of Rights . . . is that there some things—even some seemingly *desirable* things—that government cannot be trusted to do." *Austin v. Mich. Chamber of Com.*,

15

494 U.S. 652, 692 (1990) (Scalia, J., dissenting) (emphasis in original), *overruled by Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010). "Many are those who must endure speech they do not like," unadorned by disclaimers they may wish for, "but that is a necessary cost of freedom." *IMS Health*, 564 U.S. at 575.

> ### B. Even if there were a sufficiently important interest, compelling speech is far from a narrowly tailored remedy.

But even if that's wrong, New York's blunderbuss approach isn't "narrowly tailored." *Ams. for Prosperity Found.*, 594 U.S. at 610. That's also fatal to the State's scheme. "In the First Amendment context, fit matters," *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 218 (2014) (Roberts, C.J., controlling), and the State's scary labeling regime is far from a less-speech-restrictive means by which the Attorney General can further the State's alleged interest in chilling computerized pricing.

The Constitution supplies the legislature many tools to carry out such a mission without taking over private speech for public purposes. The State could choose to make government purchases only through vendors that forgo computer-generated, personalized pricing. The legislature could impose a higher sales tax on products sold via such pricing—or reduce the sales tax for goods with the same price for all

16

comers. And, of course, the State and its officials are free to use the bully pulpit to shine a spotlight on the supposed evils of computer-generated pricing, to ensure that consumers are aware that the practice exists. *Cf. Rubin*, 514 U.S. at 490–91 (voiding commercial speech restriction where the legislature had "the availability" of several "options, all of which could advance the Government's asserted interest in a manner less intrusive to [a company's] First Amendment rights").

Some of these policies would decrease consumer welfare. Others would require late nights and hard work to pass through the Assembly and Senate. But none of these approaches infringe the First Amendment's "right to refrain from speaking," *Wooley*, 430 U.S. at 714, and all would "directly advance[]" a hypothetically valid interest in discouraging or flagging computer-generated, dynamic prices. *IMS Health*, 564 U.S. at 572; *Cent. Hudson*, 447 U.S. at 566.

Better still, these options would at least force the State to grapple with the actual trade-offs of interfering with market prices. The failure of the political branches to wrestle with difficult solutions is just another cost of mandatory disclosure. Disclaimers are blithely assumed to work, and they are cheap for the government to impose. But such thoughtless,

17

untargeted disclosure regimes "undermine other regulation and ease pressure on lawmakers to enact better but more controversial regulation. Thus bad law drives out better." Omri Ben-Shaher and Carl Schnieder 170, *More Than You Wanted to Know: The Failure of Mandated Disclosure* (Kindle Ed. 2014).

### III. CLOSE COMPELLED-SPEECH QUESTIONS SHOULD BE RESOLVED FOR THE SPEAKER, NOT THE COMPELLER.

But let's say all of that is wrong. So long as something of constitutional doubt remains, the Court should still reverse. The Supreme Court has instructed that "[w]here the First Amendment is implicated, the tie goes to the speaker, not the censor." *Wis. Right to Life, Inc.*, 551 U.S. at 474 (Roberts, C.J., controlling). Because First Amendment liberties are priceless and their loss is irreplaceable, censors and compellers do not get the benefit of the doubt. As Justice Douglas aptly put it, "[t]he wrong is compounded when the issue, though closely balanced in the minds of sophisticated men, is resolved against freedom of expression and on the side of censorship." *Bantam Books*, 372 U.S. at 73 (Douglas, J., concurring).

**CONCLUSION**

The First Amendment forbids the State from interrupting a bona fide commercial transaction with a pointless and scary disclaimer. The Court should reverse.

Respectfully submitted,

/s/ Zac Morgan
Cory L. Andrews
Zac Morgan
   *Counsel of Record*
WASHINGTON LEGAL FOUNDATION
2009 Massachusetts Ave. NW
Washington, DC 20036
(202) 588-0302
zmorgan@wlf.org

*Counsel for Amicus Curiae*
*Washington Legal Foundation*

January 13, 2026

19

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limits of Federal Rule of Appellate Procedure 29(a)(5) because it contains 3,640 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f).

I also certify that this brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and (6) because it uses 14-point Century Schoolbook font.

/s/ Zac Morgan
Zac Morgan
*Counsel for Amicus Curiae*
*Washington Legal Foundation*

January 13, 2026

20