# 25-2818

## United States Court of Appeals for the Second Circuit

NATIONAL RETAIL FEDERATION,

*Plaintiff-Appellant*,

v.

LETITIA JAMES, in her official capacity as Attorney General of New York,

*Defendant-Appellee*.

On Appeal from the United States District Court
for the Southern District of New York

## BRIEF FOR APPELLEE

LETITIA JAMES
*Attorney General*
*State of New York*
Attorney for Appellee
28 Liberty Street
New York, New York 10005
(212) 416-8921

BARBARA D. UNDERWOOD
*Solicitor General*
ESTER MURDUKHAYEVA
*Deputy Solicitor General*
GILLIAN BARNA
*Assistant Solicitor General*
*of Counsel*

Dated: February 10, 2026

# TABLE OF CONTENTS


**Page**

TABLE OF AUTHORITIES ........ iii

PRELIMINARY STATEMENT ........ 1

ISSUES PRESENTED ........ 3

STATEMENT OF THE CASE ........ 3

A. Retailers' Use of Personalized Algorithmic Pricing ........ 3

B. New York's Efforts to Address Concerns About Personalized Algorithmic Pricing ........ 5

C. The District Court's Dismissal of Plaintiff's First Amendment Challenge ........ 7

STANDARD OF REVIEW ........ 8

SUMMARY OF ARGUMENT ........ 9

ARGUMENT ........ 11

POINT I

THE DISTRICT COURT PROPERLY DISMISSED PLAINTIFF'S FIRST AMENDMENT CHALLENGE ........ 11

A. The District Court Did Not Err in Determining the Applicable Standard of Constitutional Scrutiny. ........ 11

B. The District Court Correctly Held That the Act Is Subject to Review Under *Zauderer*. ........ 13

1. The challenged disclosure consists of factual information. ........ 15

**Page**


2. The challenged disclosure consists of uncontroversial information. .......... 22

3. Plaintiff's remaining arguments in favor of strict or intermediate scrutiny are meritless. .......... 24

C. The District Court Correctly Held That the Act Is Constitutional Under *Zauderer*. .......... 29

D. In the Alternative, the Act Satisfies Intermediate Scrutiny Review. .......... 35

POINT II

THE DISTRICT COURT PROPERLY DISMISSED THE COMPLAINT WITH PREJUDICE .......... 37

CONCLUSION .......... 39

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*American Meat Inst. v. U.S. Dep't of Agric.*,
760 F.3d 18 (D.C. Cir. 2014) .......... 20

*Barnes v. Glen Theatre, Inc.*,
501 U.S. 560 (1991) .......... 21

*CompassCare v. Hochul*,
125 F.4th 49 (2d Cir. 2025) .......... 19, 21-24, 28-29, 34

*Connecticut Bar Ass'n v. United States*,
620 F.3d 81 (2d Cir. 2010) .......... 12, 16, 22, 29

*Cortec Indus., Inc. v. Sum Holding L.P.*,
949 F.2d 42 (2d Cir. 1991) .......... 38

*CTIA - The Wireless Ass'n v. City of Berkeley*,
928 F.3d 832 (9th Cir. 2019) .......... 20

*Discount Tobacco City & Lottery, Inc. v. United States*,
674 F.3d 509 (6th Cir. 2012) .......... 20

*Document Techs., Inc. v. LDiscovery, LLC*,
731 F. App'x 31 (2d Cir. 2018) .......... 37

*Dupree v. Younger*,
598 U.S. 729 (2023) .......... 12

*Expressions Hair Design v. Schneiderman*,
877 F.3d 99 (2d Cir. 2017) .......... 20

*Gallop v. Cheney*,
642 F.3d 364 (2d Cir. 2011) .......... 38

*Hogan v. Fischer*,
738 F.3d 509 (2d Cir. 2013) .......... 8

**Cases** **Page(s)**

*In re Nortel Networks Corp. Sec. Litig.*,
539 F.3d 129 (2d Cir. 2008) ........................................................ 22

*International Dairy Foods Ass'n v. Amestoy*,
92 F.3d 67 (2d Cir. 1996) ........................................................... 31

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015) ........................................................ 37

*Lorillard Tobacco Co. v. Reilly*,
533 U.S. 525 (2001) ..................................................................... 36

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
559 U.S. 229 (2010) ......................................................... 14, 16, 19, 36

*National Ass'n of Wheat Growers v. Bonta*,
85 F.4th 1263 (9th Cir. 2023) ...................................................... 17

*National Elec. Mfrs. Ass'n v. Sorrell*,
272 F.3d 104 (2d Cir. 2001) .......................................... 13, 19, 29-30

*National Inst. of Fam. & Life Advocs. v. Becerra*,
585 U.S. 755 (2018) ...................................................... 14, 27-28

*New York State Rest. Ass'n v. New York City Bd. of Health*,
556 F.3d 114 (2d Cir. 2009) ............................... 19, 23-24, 26-27, 34

*Pharmaceutical Care Mgmt. Ass'n v. Rowe*,
429 F.3d 294 (1st Cir. 2005) ........................................................ 20

*Poughkeepsie Supermarket Corp. v. Dutchess County*,
648 F. App'x 156 (2d Cir. 2016) ........................................... 12, 19, 29

*R J Reynolds Tobacco Co. v. Food & Drug Admin.*,
96 F.4th 863 (5th Cir. 2024) ................................................... 20, 34

*Ronzani v. Sanofi S.A.*,
899 F.2d 195 (2d Cir. 1990) ........................................................ 37

**Cases** **Page(s)**

*Ruffolo v. Oppenheimer & Co.*,
987 F.2d 129 (2d Cir. 1993) .......... 39

*Safelite Grp., Inc. v. Jepsen*,
764 F.3d 258 (2d Cir. 2014) .......... 20

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) .......... 25-26

*Tannerite Sports, LLC v. NBCUniversal News Grp.*,
864 F.3d 236 (2d Cir. 2017) .......... 38

*Volokh v. James*,
148 F.4th 71 (2d Cir. 2025) .......... 11-13, 18-20, 23

*Vugo v. City of New York*,
931 F.3d 42 (2d Cir. 2019) .......... 35-37

*Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*,
471 U.S. 626 (1985) .......... 13, 34

**Statutes**

*Federal*

15 U.S.C. § 6801 et seq. .......... 27

*New York*

General Business Law
§ 340-b .......... 5
§ 349-a .......... passim

**Miscellaneous Authorities** **Page(s)**

Adam Tanner, *Different Customers, Different Prices, Thanks to Big Data* Forbes (Mar. 26, 2014), https://www.forbes.com/sites/adamtanner/2014/03/26/different-customers-different-prices-thanks-to-big-data/#5dc657545730 .......... 31

Alexander J. MacKay & Samuel N. Weinstein, *Dynamic Pricing Algorithms, Consumer Harm, and Regulatory Response*, 100 Wash. U. L. Rev. 111 (2022) .......... 31

Ariel Ezrachi & Maurice E. Stucke, *Artificial Intelligence & Collusion: When Computers Inhibit Competition*, 2017 U. Ill. L. Rev. 1775 (2017) .......... 31

BBC News, *Travel Site Orbitz Offers Mac Users More Costly Hotels* (June 26, 2012), https://www.bbc.com/news/technology-18595347 .......... 4, 31

*Black's Law Dictionary* (12th ed. 2024) (Westlaw) .......... 17

Chris Hrapsky, *The Target App Price Switch: What You Need to Know* (Jan. 27, 2019), https://www.kare11.com/article/money/consumer/how-to-avoid-target-app-parking-lot-price-switch/89-9ef4106a-895d-4522-8a00-c15cff0a0514 .......... 4, 31

Christopher R. Leslie, *Predatory Pricing Algorithms*, 98 N.Y.U. L. Rev. 49 (Apr. 2023) .......... 3-4, 30, 32

Fed. Trade Comm'n, *Issue Spotlight: The Rise of Surveillance Pricing* (n.d.), https://www.ftc.gov/system/files/ftc_gov/pdf/sp6b-issue-spotlight.pdf .......... 3-4

**Miscellaneous Authorities** **Page(s)**

Julia Angwin, Surya Mattu, & Jeff Larson, *The Tiger Mom Tax: Asians Are Nearly Twice as Likely to Get a Higher Price from Princeton Review*, ProPublica (Sept. 1, 2015), https://www.propublica.org/article/asians-nearly-twice-as-likely-to-get-higher-price-from-princeton-review ............................ 31

Kashmir Hill, *How Target Figured Out a Teen Girl Was Pregnant Before Her Father Did*, Forbes (Feb. 16, 2012), https://www.forbes.com/sites/kashmirhill/2012/02/16/how-target-figured-out-a-teen-girl-was-pregnant-before-her-father-did/#4e4def1434c6 ........................................................ 31

Katie J. Wells et al., Groundwork Collaborative & Consumer Reps., *Same Cart, Different Price: Instacart's Price Experiments Cost Families at Checkout* (n.d.), https://groundworkcollaborative.org/wp-content/uploads/2025/12/Same-Cart-Different-Price.pdf............ 31, 33

Off. of the Governor, *Memorandum in Support for Article VII Legislation: FY 2026 New York State Executive Budget – Transportation, Economic Development and Environmental Conservation* (n.d.), https://www.budget.ny.gov/pubs/archive/fy26/ex/artvii/ted-memo.pdf........................................................................ 6, 21

Oren Bar-Gill, Cass R. Sunstein, & Inbal Talgam-Cohen, *Algorithmic Harm in Consumer Markets*, 15 J. Legal Analysis 1 (2023)............................................................ 30-31

Oren Bar-Gill, *Algorithmic Price Discrimination When Demand Is a Function of Both Preferences and (Mis)perceptions*, 86 U. Chi. L. Rev. 217 (Mar. 2019)............................................. 4, 31-32

Pascale Chapdelaine, *Algorithmic Personalized Pricing*, 17 N.Y.U. J.L. & Bus. 1 (2020) ..................................................... 4, 22

**Miscellaneous Authorities** **Page(s)**

Salil K. Mehra, *Price Discrimination-Driven Algorithmic Collusion: Platforms for Durable Cartels*, 26 Stanford J.L. Bus. & Fin. 171 (2021) .......... 3

## PRELIMINARY STATEMENT

In 2024, the New York State Legislature enacted the Algorithmic Pricing Disclosure Act, which requires retailers that use personalized algorithmic pricing to disclose that fact to consumers. *See* General Business Law (G.B.L.) § 349-a. Plaintiff National Retail Foundation (NRF) filed this lawsuit, arguing that the Act is unconstitutional under the First Amendment on its face and as applied to plaintiff's members, and seeking to enjoin its enforcement. The U.S. District Court for the Southern District of New York (Rakoff, J.) granted defendant New York Attorney General's motion to dismiss the complaint and denied NRF's motion for a preliminary injunction as moot. This Court should affirm.

At the outset, NRF argues that the district court erred in identifying the appropriate level of First Amendment scrutiny at the pleading stage. Specifically, NRF contends that so long as a regulation is subject to some level of First Amendment review, dismissal on the pleadings is improper. That argument finds no support in the case law or the rules of civil procedure. The applicable level of constitutional scrutiny turns on the scope of a challenged state action and is routinely resolved

as a matter of law, where, as here, there is no dispute about the scope of the statute at issue.

On the merits, the district court correctly held that the disclosure required by the Algorithmic Pricing Disclosure Act consists of solely factual and uncontroversial information—namely, a retailer's use of algorithmic pricing—and is therefore subject to review under *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626 (1985). The Act satisfies *Zauderer*'s relaxed standard for commercial disclosures because it furthers the State's interest in informing consumers about the terms under which they purchase goods and services and empowers consumers to identify and avoid the significant potential harms posed by personalized algorithmic pricing. The district court correctly rejected NRF's speculative attempts to interpret the challenged disclosure as misleading and burdensome.

Finally, the district court properly dismissed the complaint with prejudice because NRF never sought leave to amend, and amendment would be futile in any event.

## ISSUES PRESENTED

1. Whether the district court correctly dismissed plaintiff's First Amendment challenge to a state law requiring retailers to disclose their use of personalized algorithmic pricing to consumers.

2. Whether the district court properly dismissed plaintiff's complaint with prejudice.

## STATEMENT OF THE CASE

### A. Retailers' Use of Personalized Algorithmic Pricing

In the last decade, retailers have increasingly relied on computer algorithms to harvest vast troves of consumer data, including purchase history, location data, and demographic information, and use that data to set the price of goods or services.[1] The sophistication of the technology used by retailers varies, with more basic algorithms setting prices "in response to rules and parameters dictated by humans" and more advanced

---

[1] *See* Fed. Trade Comm'n, *Issue Spotlight: The Rise of Surveillance Pricing* 1-2 (n.d); Christopher R. Leslie, *Predatory Pricing Algorithms*, 98 N.Y.U. L. Rev. 49, 64 (Apr. 2023); Salil K. Mehra, *Price Discrimination-Driven Algorithmic Collusion: Platforms for Durable Cartels*, 26 Stanford J.L. Bus. & Fin. 171, 180-181 (2021). (For authorities available online, full URLs appear in the table of authorities. All URLs were last visited on February 10, 2026.)

algorithms, "imbued with artificial intelligence," learning and adapting to set prices on their own.[2]

Algorithmic pricing technology enables retailers to charge "different prices to different consumers," often based on a "consumer's perceived willingness to pay."[3] A consumer's "entire online digital footprint" can be utilized in a pricing algorithm, including their "commercial transactions, lifestyle, habits, hobbies, preferences, social networks, and work platforms."[4] Several prominent examples of differential pricing set by algorithms include Mac users being charged more for hotel rooms than PC users[5] and Target shoppers seeing price increases when they browse online inside a Target store.[6]

---

[2] Leslie, *supra,* at 65.

[3] *Id.* at 72-73; *see* Oren Bar-Gill, *Algorithmic Price Discrimination When Demand Is a Function of Both Preferences and (Mis)perceptions*, 86 U. Chi. L. Rev. 217, 217 (Mar. 2019).

[4] Pascale Chapdelaine, *Algorithmic Personalized Pricing*, 17 N.Y.U. J.L. & Bus. 1, 9-10 (2020); *see* Fed. Trade Comm'n*, supra,* at 4-10.

[5] BBC News, *Travel Site Orbitz Offers Mac Users More Costly Hotels* (June 26, 2012).

[6] Chris Hrapsky, *The Target App Price Switch: What You Need to Know*, KARE11 (Jan. 27, 2019).

### B. New York's Efforts to Address Concerns About Personalized Algorithmic Pricing

The New York State Legislature has taken various actions to address the potential misuse of personalized algorithmic pricing. For example, New York prohibits residential landlords or property managers from setting or adjusting rental prices using algorithmic pricing. G.B.L. § 340-b(3). New York law also prohibits the use of algorithmic pricing to facilitate noncompetition agreements between residential landlords or property managers with respect to residential units. *Id.* § 340-b(2).

The Act, by contrast, does not prohibit personalized algorithmic pricing. Instead, the Act requires "[a]ny entity that sets the price of a specific good or service using personalized algorithmic pricing, and that directly or indirectly, advertises, promotes, labels or publishes a statement, display, image, offer or announcement of personalized algorithmic pricing to a consumer in New York" to include the following disclosure with the price offered for the good or service: "THIS PRICE WAS SET BY AN ALGORITHM USING YOUR PERSONAL DATA." G.B.L. § 349-a(2).

The Act defines "[p]ersonalized algorithmic pricing" as pricing that fluctuates dependent on conditions and is "set by an algorithm that uses personal data." *Id.* § 349-a(1)(e), (f). The Act also defines "[p]ersonal data"

as "any data that identifies or could reasonably be linked, directly or indirectly, with a specific consumer or device."[7] *Id.* § 349-a(1)(d). The purpose of the Act is "to help enhance consumers' awareness of sellers that offer or sell goods or services at a price based on personalized consumer data" and to "help enhance consumer protections."[8]

The Act does not authorize a private right of action and may be enforced only by the Attorney General of the State of New York. If the Attorney General has reason to believe that the disclosure requirement has been violated, she "shall dispatch a cease and desist letter" specifying the alleged violation, as well as the remedies and designated timeline to

---

[7] The Act exempts certain entities and activities from the disclosure requirement, specifically (1) entities already subject to New York's insurance law or the regulations promulgated thereunder; (2) financial institutions subject to certain federal regulations; and (3) pricing offered to a consumer with an existing subscription-based contract or agreement that is less than the price set forth in the contract or agreement. G.B.L. § 349-a(3). The Act further exempts from the definition of "[p]ersonal data" location data used by a for-hire vehicle to the extent that it is used to "calculate the fare based on mileage and trip duration between the passenger's pickup and drop-off locations." *Id.* § 349-a(1)(d).

[8] Off. of the Governor, *Memorandum in Support for Article VII Legislation: FY 2026 New York State Executive Budget – Transportation, Economic Development and Environmental Conservation* 20 (n.d.).

cure such violation. *Id.* § 349-a(4). If the violation persists, the Attorney General may seek injunctive relief and civil penalties in court. *Id.*

### C. The District Court's Dismissal of Plaintiff's First Amendment Challenge

In July 2025, NRF, a retail trade association, commenced this action against the New York Attorney General in the U.S. District Court for the Southern District of New York. The complaint asserts that the Act violates the First and Fourteenth Amendments on its face and as applied to plaintiffs' members and seeks declaratory and injunctive relief. (Appendix (A.) 24.) NRF also moved for a preliminary injunction against enforcement of the Act pending resolution of the litigation. (ECF No. 9.) The Attorney General opposed the motion for a preliminary injunction and cross-moved to dismiss the complaint. (ECF Nos. 21, 30.)

In October 2025, the district court (Rakoff, J.) granted the Attorney General's motion to dismiss the complaint with prejudice and denied NRF's motion for a preliminary injunction as moot. (A. 402-429.) First, the district court determined that the Act was subject to scrutiny under *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626. (A. 408-420.) Specifically, the district court concluded that

the disclosure required by the Act is factual and uncontroversial because it accurately describes plaintiff's members' practices and is not misleading. (A. 412-419.)

Second, applying *Zauderer*'s standard of review, the district court held that the disclosure requirement is "reasonably related to the government's legitimate interest in ensuring that consumers are informed about the terms on which products are offered to them." (A. 422 (quotation and alteration marks omitted).) The district court rejected plaintiff's argument that the disclosure fails to advance a legitimate state interest (A. 424-425) and declined to find that the one-sentence disclosure is "unduly burdensome" (A. 427-428).

## STANDARD OF REVIEW

This Court reviews de novo the district court's grant of a motion to dismiss for failure to state a claim. *Hogan v. Fischer*, 738 F.3d 509, 515 (2d Cir. 2013).

## SUMMARY OF ARGUMENT

I. The district court properly dismissed NRF's First Amendment challenge to the Act.

A. The district court properly identified the applicable level of constitutional scrutiny in resolving the Attorney General's motion to dismiss. In a constitutional challenge, the applicable level of scrutiny is a question of law based on the scope of a challenged state action. Such issues are commonly resolved at the pleading stage. To be sure, there are some cases in which disputes about the way a regulation operates may delay resolution of the appropriate level of scrutiny. Here, however, there is no dispute about whom the Act regulates or how it regulates them. The district court therefore correctly reached the question of what level of First Amendment scrutiny applies to plaintiff's challenge.

B. The district court correctly determined that the Act is subject to review under *Zauderer*. The Act requires covered entities to disclose factual, uncontroversial information about the terms under which they offer a good or service to consumers. This Court has consistently held that such commercial disclosure requirements are subject to relaxed scrutiny under *Zauderer*.

C. The district court correctly held that the Act is consistent with the First Amendment under *Zauderer* because the statute is reasonably related to the State's interest in providing consumers with accurate information about whether their personal data was used by an algorithm to set the price of a good or service, which in turn, allows consumers to make more informed purchasing decisions. The one-sentence disclosure required by the Act does not unduly burden commercial speech because it requires covered entities to disclose only information about their own business practices and does not preclude retailers from conveying their own beliefs about the use of personalized algorithmic pricing.

D. This Court may affirm on the alternative ground that the Act is consistent with the First Amendment even under the intermediate scrutiny standard applicable to other types of commercial speech restrictions. The State has a substantial interest in empowering consumers to identify and avoid potential and significant harms that personalized algorithmic pricing can inflict. The disclosure requirement directly advances the State's interest and is carefully tailored to apply in circumstances where that interest will be furthered.

II. The district court did not abuse its discretion in dismissing NRF's complaint with prejudice. NRF did not ask the district court for leave to amend its complaint, nor can it identify additional factual allegations that would have any bearing on the court's First Amendment analysis.

## ARGUMENT

## POINT I

### THE DISTRICT COURT PROPERLY DISMISSED PLAINTIFF'S FIRST AMENDMENT CHALLENGE

### A. The District Court Did Not Err in Determining the Applicable Standard of Constitutional Scrutiny.

At the outset, NRF contends that "the [d]istrict [c]ourt should not have determined the appropriate level of First Amendment scrutiny at the motion-to-dismiss stage" because the complaint purportedly alleged "that the disclosure creates rather than remediates confusion." Br. for Pl.-Appellant (Br.) at 15; *see id.* at 19-22. This argument is entirely misplaced.

When a law regulating speech is challenged under the First Amendment, the standard of review to be applied depends on the type of expression at issue and the nature of the regulation. *See Volokh v. James*,

148 F.4th 71, 84-85 (2d Cir.), *certification accepted*, 44 N.Y.3d 963 (2025). Specifically, courts consider whether the regulation pertains to commercial or noncommercial speech, whether the regulation restricts speech or compels it, and whether the regulation regulates speech based on its substance or speaker. *See id.*

Because these questions can often be settled without factual development, the applicable level of scrutiny presents a legal question readily resolvable on a motion to dismiss. *See Dupree v. Younger*, 598 U.S. 729, 737 (2023). Indeed, the applicable level of scrutiny is regularly, if not predominantly, decided as a matter of law, including at the pleading stage. *See, e.g.*, *Connecticut Bar Ass'n v. United States*, 620 F.3d 81, 93, 104 (2d Cir. 2010) (determining that *Zauderer* review applies to a commercial disclosure on a motion to dismiss); *Poughkeepsie Supermarket Corp. v. Dutchess County,* 648 F. App'x 156, 157-58 (2d Cir. 2016) (same).

In certain cases, courts may identify a genuine dispute between the parties regarding the scope of a compelled disclosure, a dispute that precludes a determination of what level of review should apply. For example, in *Volokh*, this Court determined that it could not resolve an appeal from a preliminary injunction until the New York Court of

Appeals clarified what the disclosure law at issue required. 148 F.4th at 89-94. Here, by contrast, the scope of the Act is undisputed—the parties agree as to what the Act requires and to whom it applies. The district court therefore correctly resolved the applicable level of scrutiny at the pleading stage.

### B. The District Court Correctly Held That the Act Is Subject to Review Under *Zauderer*.

The district court also correctly decided that the disclosure required by the Act is subject to relaxed scrutiny under the *Zauderer* standard.

"[C]ommercial speech is subject to less stringent constitutional requirements than are other forms of speech." *National Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 113 (2d Cir. 2001) ("*NEMA*") (quotation marks omitted). Moreover, laws that require entities to make factual disclosures to consumers are subject to a lower degree of scrutiny than laws otherwise restricting commercial speech. *Id.* at 114-15. In other words, the law recognizes the "material differences" between compelled disclosures and speech restrictions, and the extent to which these differing types of regulations implicate the constitutionally protected interest in commercial speech. *See Zauderer*, 471 U.S. at 650. "Because the extension of First

Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides," a commercial speaker's "constitutionally protected interest in *not* providing any particular factual information . . . is minimal." *Id.* at 651.

Accordingly, regulations requiring providers of commercial services to disclose "factual and uncontroversial information" about the terms under which their "services will be available" are analyzed under a framework akin to rational basis review when they are challenged under the First Amendment. *See id.* at 651. Under that framework, commercial disclosure regulations comport with the First Amendment if they reasonably relate to an appropriate governmental interest and do not unduly burden speech. *See id.* at 650-51; *National Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 768 (2018) ("*NIFLA*"); *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 248-253 (2010).

### 1. The challenged disclosure consists of factual information.

As explained above (at 5) the Act requires covered entities to include the following disclosure when charging a price for a good or service that was set by personalized algorithmic pricing: "THIS PRICE WAS SET BY AN ALGORITHM USING YOUR PERSONAL DATA." G.B.L. § 349-a(2). The district court correctly concluded that the plain text of this disclosure accurately describes the practices of the retailers to whom it applies (A. 412-413) and NRF concedes on appeal that the disclosure required by the Act is "literally true" (*see* Br. at 32 (quotation marks omitted)). The district court therefore correctly found that the Act requires a "factual" disclosure within the meaning of *Zauderer*. None of the contrary arguments raised by NRF has merit.

First, NRF argues that *Zauderer* should not apply because the disclosure is purportedly misleading. *See* Br. at 32. This Court has never held that a regulated party's self-serving allegation that a "literally true" disclosure is misleading is sufficient to defeat a motion to dismiss under *Zauderer*. In any event, the disclosure required by the Act is not misleading.

The disclosure does not, as NRF contends, suggest that a retailer used an algorithm to calculate the highest price the consumer would be

willing to pay or used the consumer's Social Security number, medical records, biometric information, or demographic information as inputs in arriving at the set price. *Contra* Br. at 34-35. The language of the disclosure says nothing about how any algorithm calculated the set price or the type of data used. The disclosure merely informs consumers, when true, that an offered price was "set by an algorithm using your personal data." G.B.L. § 349-a(2).

The district court correctly rejected (A. 413-416) NRF's speculation that consumers necessarily would draw adverse conclusions from the disclosure. For example, it is difficult to imagine that an ordinary consumer would infer from the disclosure that the price they are charged for "grilling tools," "backpacks," "haircare," or any number of products sold by NRF's members was based on their Social Security numbers or medical records. (*See* A. 42, 48, 51.) More fundamentally, NRF's members are free to explain to consumers how they use algorithmic pricing to set a price or divulge the type of data used by their algorithms. The availability of this option provides an "additional assurance that consumers will not misunderstand" the disclosure. *Milavetz*, 559 U.S. at 251-52; *see Connecticut Bar Ass'n*, 620 F.3d at 98.

The Ninth Circuit's decision in *National Association of Wheat Growers v. Bonta*, 85 F.4th 1263 (9th Cir. 2023), on which plaintiff relies is thus inapposite. *See* Br. at 32-36. There, the Court struck down, as "false and misleading," a mandatory disclosure warning consumers that a product containing glyphosate may expose them to a "known carcinogen." 85 F.4th at 1266, 1278. The Court recognized the scientific divide on whether glyphosate was a carcinogen and concluded that an ordinary consumer, ascribing the common meaning to the term "known," would not understand that the "complex legal meaning" of "known" within the statute means "known" only to the State of California and not necessarily "known" to the scientific community. *Id.* at 1269, 1278 (quotation marks omitted). But here, an ordinary consumer's reading of the disclosure using the common meaning of the disclosure's words would be an accurate one.

Similarly, NRF misses the mark in arguing that consumers are incapable of understanding the "nuance" of the term "personal data" as used in the disclosure. *See* Br. at 35-36 (quotation marks omitted). "Personal data" means as it says: data pertaining to a specific person. *Compare Black's Law Dictionary*, "data" (subentry "personal data") (12th ed. 2024) (Westlaw) ("Data that is either directly linked to or traceable to

a specific individual"), *with* G.B.L. § 349-a(1)(d) (defining "[p]ersonal data" as "any data that identifies or could reasonably be linked, directly or indirectly, with a specific consumer or device"). NRF is correct that the term "personal data" *could* include sensitive information like Social Security numbers, medical records, and biometric data, but the term also plainly includes information NRF considers more anodyne, such as a consumer's purchase history. *See* Br. at 35. The language of the disclosure does not expressly state or otherwise imply to consumers that a retailer is using *sensitive* personal data in pricing decisions. And again, a retailer can always explain how it uses personal data in pricing.

Second, NRF incorrectly argues that *Zauderer* should not apply because the Act does not seek to correct misleading or deceptive commercial speech. *See* Br. at 29-31. NRF's argument is beside the point, because this Court has held that "*Zauderer* supplies the governing standard when evaluating the constitutionality of a law" addressing *either* misleading commercial speech *or* "its equivalent, the non-disclosure of information material to the consumer." *Volokh*, 148 F.4th at 87 (quotation marks omitted). Indeed, this Court has routinely applied *Zauderer*'s framework to commercial disclosure requirements that are "not intended to prevent

consumer confusion or deception per se, but rather to better inform consumers about the products they purchase." *NEMA*, 272 F.3d at 115 (quotation marks and citation omitted) (disclosure of mercury content and mercury disposal instructions for lightbulbs).[9]

NRF is therefore wrong to suggest (Br. at 30) that the Supreme Court's decision in *Milavetz* and this Court's decision in *CompassCare* limit *Zauderer* to disclosures aimed at addressing deception. The disclosures at issue in those cases were explicitly aimed at preventing consumer deception and the courts therefore had no reason to address whether compelled disclosures aimed at addressing other state interests should be reviewed under *Zauderer*. *See Milavetz*, 559 U.S. at 252-53; *CompassCare v. Hochul*, 125 F.4th 49, 67 (2d Cir. 2025). This Court has since reaffirmed that *Zauderer* is the proper standard to review

[9] *See, e.g.*, *Volokh*, 148 F.4th at 89 (disclosure of social media network's content moderation policies); *Poughkeepsie Supermarket Corp.*, 648 F. App'x at 157-58 (disclosure of item pricing of retailer's own goods); *New York State Rest. Ass'n v. New York City Bd. of Health*, 556 F.3d 114, 133-34 (2d Cir. 2009) ("*NYSRA*") (disclosure of calorie content of menu items).

disclosures intended to address issues other than deception.[10] *See Volokh*, 148 F.4th at 87; *see also Expressions Hair Design v. Schneiderman*, 877 F.3d 99, 104 (2d Cir. 2017). Moreover, numerous sister courts of appeals have likewise agreed that "*Zauderer* applies even when the government's claimed primary interest is not the prevention of consumer deception."[11] *R J Reynolds Tobacco Co. v. Food & Drug Admin.*, 96 F.4th 863, 883 (5th Cir.), *cert. denied*, 145 S. Ct. 592 (2024).

In any event, the Act's disclosure requirement in fact works to prevent consumer deception, as the district court correctly determined.[12]

---

[10] To the extent plaintiff argues that this Court's decision in *Safelite Group, Inc. v. Jepsen*, 764 F.3d 258 (2d Cir. 2014), confines *Zauderer* to the realm of consumer deception (Br. at 30-31), that argument is baseless. There, this Court applied intermediate scrutiny solely because the compelled disclosure went "beyond the speaker's own product or service" and amounted to a "free advertisement for [the speaker's] competitor." 764 F.3d 258, 264 (2d Cir. 2014). Here, the Act's disclosure applies only if the price of a retailer's good or service was actually set by personalized algorithmic pricing. *See* G.B.L. § 349-a(2).

[11] *See also CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 844 (9th Cir. 2019); *American Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 21-23 (D.C. Cir. 2014); *Discount Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 556-58 (6th Cir. 2012); *Pharmaceutical Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 310 n.8 (1st Cir. 2005).

[12] NRF erroneously asserts that the State has conceded that G.B.L. § 349-a was not designed to prevent deception. Br. at 30. (*See* Mem. of Law in Support of Defs.' Mot. to Dismiss the Compl. at 1 (July 28, 2025),

(*continued on the next page*)

(*See* A. 420.) Specifically, the Act provides valuable information to consumers of which they would otherwise be unaware, thus obviating the potential for deception that the offer price is set on the basis of factors that do not include the consumer's personal data, and deception that the offer price is necessarily the same as that offered to all consumers. The Act's disclosure resembles the law at issue in *CompassCare*, which required employers to inform employees of their rights and remedies under certain labor law provisions. *See* 125 F.4th at 53. This Court upheld the disclosure requirement under *Zauderer*, concluding that the disclosure requirement prevented "deception of employees as to their statutory rights." *Id.* at 67 (quotation marks omitted). Here too, the disclosure informs consumers about the ways in which the prices they are being charged have been set.

---

ECF No. 21 (describing G.B.L. § 349-a as a "groundbreaking consumer protection statute").) Indeed, an express goal of G.B.L. § 349-a is to "help enhance consumer protections." Off. of the Governor, *supra*, at 20. Moreover, a court can glean a statute's protective purpose from its plain text alone. *See Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 567-68 (1991) (determining statute's purpose even where Legislature was silent about such purpose).

Finally, NRF misses the mark in arguing that the information contained in the disclosure is not "material" to a consumer. *See* Br. at 31. At the outset, NRF waived this argument by failing to present it below. *See In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 132 (2d Cir. 2008). In any event, "[p]rice is the single most important term of most consumer transactions."[13] NRF has not, and cannot, point to any authority suggesting that information about the price of a good or service—the type of disclosure information at issue in *Zauderer* itself—can ever be deemed immaterial.

**2. The challenged disclosure consists of uncontroversial information.**

The district court also correctly concluded (A. 416-419) that the disclosure required by the Act is uncontroversial, for purposes of *Zauderer*. As this Court has explained, the mere fact that a disclosure relates in some way to an issue of public debate does not render it controversial—particularly when the disclosure is regarding a retailer's own business practice. *See CompassCare*, 125 F.4th at 65; *Connecticut Bar Ass'n*, 620 F.3d at 94, 96. Indeed, this Court has applied *Zauderer*

[13] Chapdelaine, *supra*, at 3.

review to disclosures touching on far more controversial topics than a retailer's use of personal data to set the price of a product or service. *See, e.g., CompassCare*, 125 F.4th at 65 (disclosure pertaining to reproductive healthcare decision making). Even assuming arguendo that the use of algorithmic pricing is a robustly debated and controversial topic (Br. at 37), "the fact that [plaintiff's pricing mechanisms] are what they are" is not itself controversial. *Volokh*, 148 F.4th at 90 (emphasis omitted); *see CompassCare*, 125 F.4th at 65.

NRF mistakenly contends that the challenged disclosure is controversial because it purportedly forces plaintiff's members to send a message that their "business practices are exploitative, invasive, and suspect." *See* Br. at 40. This argument is merely a recasting of NRF's claim that the disclosure is misleading, which fails for the reasons stated (at 15-18). The disclosure required by the Act does not contain a value judgment about the use of algorithmic pricing.

For similar reasons, NRF is wrong to argue (Br. at 40) that the disclosure is controversial because the mere act of disclosure purportedly sends a message to consumers that algorithmic pricing is harmful or important. That argument is foreclosed by this Court's decision in *New*

*York State Restaurant Association v. New York City Board of Health*, which involved a disclosure law requiring chain restaurants to post the caloric content of food on their menus and menu boards. *See* 556 F.3d 114, 117 (2d Cir. 2009) ("*NYSRA*"). This Court rejected the argument that the disclosure forced restaurants to espouse a message that calories were an important consideration for diners, recognizing that the government may draw attention to calorie amounts so long as the decision to do so is rational. *Id.* at 134. The same rationale applies to the Act at issue here.

### 3. Plaintiff's remaining arguments in favor of strict or intermediate scrutiny are meritless.

Plaintiff's remaining arguments in support of strict or intermediate scrutiny (Br. at 22-29) are either squarely foreclosed by this Court's case law or otherwise meritless.

First, compelled commercial disclosure laws are "not subject to strict scrutiny because they do not prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *CompassCare*, 125 F.4th at 64 (quotation marks omitted); *contra* Br. at 23 n.6. Indeed, as NRF

admits, this Court has never applied strict scrutiny review to a compelled commercial disclosure. Br. at 23 n.6.

Second, the Act does not discriminate based on the content or speaker in violation of *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011). In *Sorrell*, the Supreme Court considered a Vermont statute prohibiting pharmacies and health insurers from selling prescriber-identifying information to be used for marketing, and further prohibiting pharmaceutical manufacturers from using prescriber-identifying information in marketing. 564 U.S. at 563. The Court concluded that the statute prohibited the sale of information based on the content of a purchaser's speech (i.e., marketing), and restricted use of that information based on the speaker and the content of their speech (i.e., pharmaceutical manufacturers engaged in marketing). In reaching that conclusion, the Court noted the disparities inherent in application of the statute. For example, academic organizations could obtain prescriber-identifying information and use such information to promote the sale of generic drugs in their educational communications, while pharmaceutical manufacturers could neither obtain nor use the same information to market their products. *Id.* at 564.

*Sorrell* does not apply here. As a preliminary matter, *Sorrell* involved a *restriction* on commercial speech, which implicates a "substantially" stronger First Amendment interest than a compelled commercial *disclosure*. *See NYSRA*, 556 F.3d at 133 n.22 (quotation marks omitted). By contrast, the Act does not prohibit any retailer from utilizing personalized algorithmic pricing or espousing their own views on algorithmic pricing. Indeed, the district court noted the absence of any case applying *Sorrell* "to a run-of-the-mill commercial disclosure mandate such as the one here at issue." (A. 410.)

Moreover, the Act does not target disfavored speech or disfavored speakers. Unlike the speech restriction in *Sorrell* which, by legislative design, targeted pharmaceutical manufacturers who "convey messages that are often in conflict with the goals of the state," *Sorrell*, 564 U.S. at 565 (quotation marks omitted), the Act applies to "any entity" that uses personalized algorithmic pricing and advertises that price to a consumer. To be sure, the Act contains a handful of narrow exemptions to account for discrete circumstances in which disclosure of the use of personalized algorithmic pricing would not further the Act's aims of providing

otherwise inaccessible information to consumers.[14] The mere tailoring of a disclosure requirement to meet the Legislature's goals does not render *Zauderer* inapplicable, however. *Cf. NYSRA*, 556 F.3d at 133 n.22 (rejecting argument that heightened scrutiny applies because the calorie disclosure requirement, imposed only on certain chain restaurants, "impacts only ten percent of New York City restaurants").

For similar reasons, the Act's disclosure requirement is not comparable to the disclosures at issue in *NIFLA*. *Contra* Br. at 27-29, 54-55. In *NIFLA*, licensed crisis pregnancy centers were required to inform patients of the availability of state-sponsored services, including abortion, and provide contact information to help patients obtain these services. 585 U.S. at 766. Recognizing that the disclosure would require

---

[14] For example, insurance and financial entities are already subject to extensive regulations and industry-specific disclosure requirements under state and federal law. (A. 380-381.) *See, e.g.*, 15 U.S.C. § 6801 et seq. (regulating financial institutions' use of consumers' personal financial information). And an average consumer using a for-hire transportation service naturally understands that the price of their trip will depend on mileage and duration. (A. 380.) Lastly, a subscription-based agreement between a particular consumer and a business necessarily involves consumer-specific data to begin with, and in that context, the disclosure alongside an offer to lower the already-agreed-upon price would not further the aims of G.B.L. § 349-a. (A. 381.)

petitioners to inform women how to obtain an abortion "at the same time petitioners [were] try[ing] to dissuade women from choosing that option," the Supreme Court concluded that the disclosure "alter[ed] the content of petitioners' speech." *Id.* (quotation marks omitted). The Supreme Court separately struck down a disclosure requiring unlicensed crisis pregnancy centers to inform patients that their clinic was not a licensed medical facility. *See id.* at 761. The Supreme Court found that this was a speaker-based restriction because it applied only to unlicensed clinics providing pregnancy-related services rather than other types of services. *Id.* at 777.

Here, by contrast, the Act requires only that retailers disclose information about their own products and services, which cannot interfere with those retailers' "greater message and mission," *CompassCare*, 125 F.4th at 66. To the extent that certain entities or activities are exempt from the law, those exemptions reflect a reasonable judgment that additional disclosures would not advance the State's interest in informing consumers rather than a purported state preference for those activities or entities. See *supra* at 26-27.

### C. The District Court Correctly Held That the Act Is Constitutional Under *Zauderer*.

Under *Zauderer*, the First Amendment is satisfied "by a rational connection between the purpose of a commercial disclosure requirement and the means employed to realize that purpose." *NEMA*, 272 F.3d at 115; *see CompassCare*, 125 F.4th at 64 (*Zauderer* review resembles rational basis review). The government need not proffer "evidence or empirical data to demonstrate the rationality of mandated disclosures in the commercial context." *Connecticut Bar Ass'n*, 620 F.3d at 97-98 (quotation marks omitted). Rather, the party challenging the disclosure requirement bears the burden of "disprov[ing] every conceivable basis which might support" the requirement. *Poughkeepsie Supermarket Corp.*, 648 F. App'x at 157-58 (quotation marks omitted). As the district court correctly concluded (A. 422-429), the Act readily comports with the First Amendment under *Zauderer*.

First, the State has a "valid interest in providing complete price information to consumers," *Poughkeepsie Supermarket Corp.*, 648 F. App'x at 158, and in "better inform[ing] consumers about the products they purchase" and the terms under which they purchase them, *NEMA*, 272 F.3d at 115. The growing use of personalized algorithmic pricing to

charge consumers different prices for the same goods and services, by culling reams of personal data, has elicited justifiable concerns about fairness, personal privacy, and disparate impact.

The disclosure furthers these interests by "increasing consumer awareness" of the utilization of personalized algorithmic pricing to set a particular price. *See NEMA*, 272 F.3d at 115. Namely, the disclosure enables consumers to investigate and identify whether they are being charged fairly, to exercise control over the use of their personal data, and to avoid spending more money than other consumers on the same product. For example, consumers informed of the use of personalized algorithmic pricing can compare the price they are charged with the price offered to others, disable tracking cookies, or alter their digital profiles to reduce price discrimination.[15] When the utilization of personalized algorithmic pricing is hidden from the consumer, that consumer becomes vulnerable to all its attendant harms.[16]

---

[15] *See* Oren Bar-Gill, Cass R. Sunstein, & Inbal Talgam-Cohen, *Algorithmic Harm in Consumer Markets*, 15 J. Legal Analysis 1, 12-12 (2023); *Leslie*, *supra*, at 78.

[16] *See* Bar-Gill, Sunstein, & Talgam-Cohen, *supra*, at 24, 36.

NRF is wrong to assert (*see* Br. at 44-45, 50) that the only interest advanced by the Act is satisfying "consumer curiosity" about "a production method that has no discernable impact on a final product," *International Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 73-74 (2d Cir. 1996). Personalized algorithmic pricing undoubtedly has an effect on the goods and services offered to customers.[17] For example, a recent study found that Instacart, a grocery delivery service platform, charged grocery shoppers different prices on nearly 74% of the studied grocery items, with some shoppers seeing prices up to 23% higher than the price charged to other customers for the same item, from the same store, at the same time.[18]

---

[17] *See, e.g.*, Bar-Gill, *Algorithmic Price Discrimination*, *supra*, at 217-19, 224-25; Bar-Gill, Sunstein, & Talgam-Cohen, *supra*, at 5, 10, 14-15, 22-23; Alexander J. MacKay & Samuel N. Weinstein, *Dynamic Pricing Algorithms, Consumer Harm, and Regulatory Response*, 100 Wash. U. L. Rev. 111, 111-113, 137-44, 147 (2022); Hrapsky, *supra*; Ariel Ezrachi & Maurice E. Stucke, *Artificial Intelligence & Collusion: When Computers Inhibit Competition*, 2017 U. Ill. L. Rev. 1775, 1808-09 (2017); Adam Tanner, *Different Customers, Different Prices, Thanks to Big Data*, Forbes (Mar. 26, 2014); Julia Angwin, Surya Mattu, & Jeff Larson, *The Tiger Mom Tax: Asians Are Nearly Twice as Likely to Get a Higher Price from Princeton Review*, ProPublica (Sept. 1, 2015); Kashmir Hill, *How Target Figured Out a Teen Girl Was Pregnant Before Her Father Did*, Forbes (Feb. 16, 2012); BBC News, *supra*.

[18] Katie J. Wells et al., Groundwork Collaborative & Consumer Reps., *Same Cart, Different Price: Instacart's Price Experiments Cost Families at Checkout* 3 (n.d.).

Another study concluded that Amazon, Staples, and Steam (a videogame store) used consumers' location data to vary price by as much as 166%.[19]

Although NRF alleges that algorithmic pricing can lower consumer prices in the aggregate (A. 15), it does not dispute that algorithmic pricing can and does result in pricing discrimination. As the district court observed (A. 420 n.5), NRF concedes that its members use personalized algorithmic pricing to charge some consumers more than others for the same product (*see* A. 34 (offering "discounts" and "promotions" to some consumers)). And as the district court further recognized, "just because some consumers might in some circumstances benefit from the use of algorithmic pricing" does not mean that "consumers in general have no interest in being accurately informed about its use." (A. 420 n.5.)

Second, NRF is incorrect to argue that the Act is broader than reasonably necessary because the disclosure is required when "non-sensitive data is being used" and when "personal data is being used only to lower prices." *Contra* Br. at 53. This argument misunderstands the

---

[19] Bar-Gill, *Algorithmic Price Discrimination*, *supra*, at 225; *see also* Leslie, *supra*, at 79-80 (Amazon charges higher prices to its regular customers).

consumer protection interests served by the disclosure, including data privacy and consumer protection against price discrimination itself. See *supra* at 29-30. NRF's suggested narrowing of the Act thus sacrifices some state interests and allows harms to go unnoticed. This formulation further raises difficult questions about when an algorithm can be said to lower the price of a good. Imagine Instacart charges consumers five different prices for a dozen Lucerne eggs (as it has)[20]—$3.99, $4.28, $4.59, $4.69, and $4.79. Which consumers would get the disclosure, if any, and which would not? NRF is free to propose narrowing amendments to the Legislature, but those proposals are not relevant to First Amendment analysis.

Finally, the disclosure required by the Act is not unduly burdensome. The Act imposes a modest one-sentence disclosure that gives retailers latitude in text size, style, and color. All that is required is a "clear and conspicuous" disclosure—that is, the disclosure is printed in the same medium as the price, near the price, and in lettering and wording that is "easily visible and understandable to the average consumer." *See* G.B.L.

---

[20] *See* Wells et al., *supra*, at 11.

§ 349-a(1)(b), (2). Courts have upheld far longer and more complex disclosure requirements. *See, e.g.*, *Zauderer*, 471 U.S. at 653 n.15 (disclosure in attorney advertisement of the contingent-fee rate and that "a client may be liable for costs even if the lawsuit is unsuccessful" would not be "intrinsically burdensome"); *NYSRA*, 556 F.3d at 121 (upholding disclosure where "the font and format of calorie information must be as prominent in size and appearance as the name or price of the menu item"); *R J Reynolds Tobacco Co.*, 96 F.4th at 870 (disclosure which leaves plaintiffs 50% of packaging surface area not unduly burdensome).

Further, the Act does not interfere with the ability of plaintiff's members "to convey their own beliefs." *CompassCare*, 125 F.4th at 67. Though NRF alleges that the eleven-word disclosure requires its members to "sacrifice their own preferred speech given the limited pixel space everywhere prices are displayed," the minimal detail required by the disclosure renders NRF's concern implausible. *Contra* Br. at 53.

### D. In the Alternative, the Act Satisfies Intermediate Scrutiny Review.

If this Court agrees with the district court that the Act is subject to *Zauderer*, it need not reach the question of whether the Act would satisfy intermediate scrutiny as a commercial speech regulation. If it does conclude that intermediate scrutiny is applicable, it can either remand to the district court to consider whether the Act satisfies intermediate scrutiny, or affirm the district court's dismissal on the ground that the Act does in fact satisfy intermediate scrutiny.

Under the intermediate scrutiny standard applicable to commercial speech regulations, courts ask whether: "(1) the expression is protected by the First Amendment; (2) the asserted government interest is substantial; (3) the regulation directly advances the government interest asserted; and (4) the regulation is no more extensive than necessary to serve that interest." *Vugo v. City of New York*, 931 F.3d 42, 44 (2d Cir. 2019). The fit "between the regulator's ends and the means chosen to accomplish those ends" need only be "reasonable." *Id.* at 52 (quotation marks omitted).

As explained (at 29-32), the harms caused by personalized algorithmic pricing are substantial and supported by extensive research,

studies, and real-world examples. Though NRF asserts that the Legislature was required to hold its own "substantive hearings" and make "factual findings about actual consumer injury," intermediate scrutiny does not require as much. *Contra* Br. at 42-43. As the Supreme Court has made clear, when the potential for consumer harm is "self-evident," the State need not conduct its own studies or surveys before deciding to protect consumers. *See Milavetz*, 559 U.S. at 251. States may justify a commercial speech regulation "by reference to studies and anecdotes" or based on "history, consensus, and simple common sense." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (quotation marks omitted).

NRF is also wrong to suggest that the Act cannot survive intermediate scrutiny because it contains exemptions. *Contra* Br. at 45-46. In *Vugo*, this Court held that an exception for a single company (Taxi TV) did not render a ban on advertising in for-hire vehicles unconstitutional under intermediate scrutiny. 931 F.3d at 44-45. As in *Vugo*, the exemptions from the Act's disclosure requirement do not evince "discriminatory intent" or render the disclosure "ineffective." *Id.* at 45. The exemptions simply reflect the instances in which a disclosure would

not further the Legislature's goals. See *supra* at 26-27. Far from rendering the statute unconstitutional, this careful tailoring satisfies intermediate scrutiny's demand that the State's ends sufficiently fit the State's means. *See Vugo*, 931 F.3d at 52.

## POINT II

### THE DISTRICT COURT PROPERLY DISMISSED THE COMPLAINT WITH PREJUDICE

This Court should reject NRF's argument that the district court abused its discretion in dismissing the complaint with prejudice. *See* Br. at 55-58. At the outset, NRF never asked the district court for leave to amend, even though the Attorney General's motion expressly asked for dismissal with prejudice. *Cf. Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 169 (2d Cir. 2015) (plaintiff asked for leave to amend the complaint, in the alternative, within opposition to motion to dismiss); *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990) (same). "While leave to amend under the Federal Rules of Civil Procedure is freely granted, no court can be said to have erred in failing to grant a request that was not made." *Document Techs., Inc. v. LDiscovery, LLC*, 731 F. App'x 31, 35 (2d Cir. 2018) (citation and

quotation marks omitted). Accordingly, the "'contention that the District Court abused its discretion in not permitting an amendment that was never requested is frivolous.'" *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (quoting *Horoshko v. Citibank, N.A.*, 373 F.3d 248, 249-50 (2d Cir. 2004)).

Even if NRF had asked for the opportunity to amend its complaint in the alternative, dismissal with prejudice would have been appropriate because any proposed amendment would be futile. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991). NRF has not identified particular facts that it would introduce into an amended complaint which would render its First Amendment claim viable. *See Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 252 (2d Cir. 2017). The only amendment plaintiff proposes is a hypothetical one. Specifically, NRF asserts that it could "introduce findings from consumer surveys," which have not been conducted, to demonstrate that consumers are misled by the Act's required disclosure. Br. at 36, 57-58. These hypothetical surveys are unlikely to yield results which stray from the plain meaning of the disclosure's words. In any event, isolated instances of consumer confusion cannot possibly render *Zauderer*

inapplicable or change the application of the First Amendment analysis. Where, as here, "it appears that granting leave to amend is unlikely to be productive," a district court does not abuse its discretion in denying leave to amend. *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993).

## CONCLUSION

This Court should affirm the district court's judgment.

Dated: New York, New York
February 10, 2026

Respectfully submitted,

LETITIA JAMES
*Attorney General*
*State of New York*
Attorney for Appellee

By: */s/ Gillian Barna*
GILLIAN BARNA
Assistant Solicitor General

28 Liberty Street
New York, New York 10005
(212) 416-8921

BARBARA D. UNDERWOOD
*Solicitor General*
ESTER MURDUKHAYEVA
*Deputy Solicitor General*
GILLIAN BARNA
*Assistant Solicitor General*
*of Counsel*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Ava Mortier, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 7,459 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

*/s/ Ava Mortier*